Baxter *v.* The People.

JOHN BAXTER, plaintiff in error, *v.* THE PEOPLE OF THE STATE OF ILLINOIS, defendants in error.

## *Error to Warren.*

The Practice Act has application to civil cases only.   Motions for continuances, therefore, in criminal cases are addressed solely to the discretion of the Court, and its decisions thereon cannot be assigned for error.

If a juror is able to respond to the question, so as to satisfy his own conscience, "Is the prisoner guilty or innocent?"—then he is incompetent; but if, from not being convinced of the existence or non-existence of certain facts, he is unable to determine that question, then he is competent.

During the progress of a trial for murder, one of the jurors, while one of the counsel for the prisoner was addressing the jury, had a chill, and was, by order of the Court, placed upon a pallet, and for a time did not fully comprehend the whole of the argument, being in a drowse, though he had understood all of the evidence, and all that had been said by counsel previously. The fact that he was asleep was known to the prisoner, but the attention of no one was called to it: *Held*, under the circumstances, to be no ground for setting aside the verdict.

A person, who had assisted in the arrest of one accused of murder, and for whose arrest rewards had been offered by the State and sundry individuals, on being called upon to testify, stated these facts, as also, that he had received the reward from the State, but not from the individuals, and did not expect to receive anything from them: *Held*, that he was a competent witness.

When instructions are so drawn, either by carelessness or design, that they will be more likely to mislead than instruct a jury, it is the duty of the Court to refuse them.

By the Criminal Code of Illinois, the distinction between accessories before the fact and principals is, in fact, abolished.   By it, it is declared that such accessories shall be deemed and considered as principals, and punished accordingly, and, therefore, as principals they must be indicted.

Courts cannot pronounce a judgment, or do any other act strictly judicial on Sunday, unless expressly authorized by statute so to do.   A verdict of a jury, however, may be received on that day.

A jury, in a trial for murder, returned a verdict of guilty into Court, against the accused, and the Court pronounced a judgment thereon on Sunday: *Held*, that the verdict was properly received, but that the judgment of the Court was absolutely null and void.

INDICTMENT for murder against the plaintiff in error, tried in the Warren Circuit Court, at the November term 1846, before the Hon. Norman H. Purple and a jury, when a verdict of guilty was rendered and sentence of death pro-

nounced. A previous trial was had in the Rock Island Circuit Court, with a like result, when the accused brought the cause to this Court by writ of error, (see 2 Gilm. 578,) procured a reversal of the former judgment, and subsequently obtained a change of venue to the Warren Circuit Court.

The prominent facts and proceedings upon the last trial are adverted to by the Court in their Opinion.

*O. C. Skinner,* for the plaintiff in error.

1. The plaintiff in error was indicted as principal. The evidence shows that he was accessory *before* the fact. As to what constitutes such accessory, see Rev. Stat. 153, § 13; Const. U. S. on page 25, of Rev. Stat. Art. VI.

2. The Court erred in refusing to grant a continuance. Rev. Stat. 415, § 13.

3. The jurors, Leper and Clark, were disqualified, and should have been set aside. *Smith* v. *Eames,* 3 Scam. 78; *Gardner* v. *The People,* Ib. 88; *Sellers* v. *The People,* Ib. 414. Another juror, Sisson, was rendered incompetent to sit by reason of sudden illness during the progress of the trial.

4. The sixth instruction was improperly refused. 3 Blackf. 434.

5. The verdict, judgment and sentence were on Sunday, all of which was contrary to law. 3 Thomas' Coke, 354; 4 Black. Com. 278; 3 Tomlin's Law Dic., title *"Sunday,"* 533; 7 Comyn's Dig. 399, B. 3; *Mackelday's* case, 5 Coke, 66; *Dakin's* case, 3 Saund. 290; *Swann* v. *Broome,* 3 Burrow, 1595; *Story* v. *Elliott,* 8 Cowen, 27; *Pearce* v. *Atwood,* 13 Mass. 347; *Bayley* v. *Smith,* 12 Wend. 59; *Frost* v. *Hall,* 4 New Hamp. 158; *King* v. *Strain,* 6 Blackf. 447; *Arthur* v. *Mosby,* 2 Bibb, 589; *Shaw* v. *McCombs,* 2 Bay, 232; *Nabors* v. *The State,* 6 Ala. 200.

6. The reversal of a judgment operates necessarily as a reversal of all former proceedings. 1 Chitty's Crim. Law, 755; 3 Comyn's Dig. title *"Error,"* B. 568; 2 Hawk. P. C. 655, §§ 18, 19; 2 Bac. Abr. 503, M; *The King* v. *Ellis,* 11 Eng. Com. Law R. 260; *Same* v. *Bourne,* 34 do. 37; *Commonwealth* v. *Shepard,* 2 Metc. 419–20.

Baxter *v.* The People.

*J. Knox,* for the defendants in error.

1. The statute makes an accessory *before* the fact a principal. Rev. Stat. 153, § 13.

2. As to the continuance, the Court gave all the indulgence that could be asked. The cause had been once continued since the change of venue to the county of the last trial. Moreover, the Practice Act in regard to this matter does not apply to criminal cases, but the whole lies within the discretion of the Court.

3. The Court committed no error in permitting the jurors, Leper and Clark, to be sworn. They had formed no definite and fixed opinion as to the merits of the case, such as would bring them within the cases cited by the counsel who has opened the case. Nor was there a valid objection to the juror, Sisson; he could not, by his affidavit, impeach his own verdict.

4. The sixth instruction was unintelligible to the Court and calculated to mislead or confuse the jury, and it was properly refused.

5. The verdict was properly received on Sunday. 15 Johns. 118, 178; 8 Cowen, 31. There being no statutory regulation upon the subject of entering judgments, &c. on Sunday, and the prohibition if any, being by the Common Law, it is resolved into this: Is the Common Law applicable to this country? We think not. If the Court think otherwise, we then contend, that as the verdict was properly received on that day, the Court here, according to a well established practice, may now render such a judgment as should have been rendered in the Court below.

*D. B. Campbell,* Attorney General, concluded the argument in behalf of the People.

*J. Manning,* for the plaintiff in error.

The continuance was improperly refused. The Act of the summer session of 1837, is applicable to criminal as well as civil cases, and the fact that it has been incorporated into the Practice Act of the Revised Statutes is no reason why it should not now, as before, be considered thus applicable.

The plaintiff in error should have been indicted as acces-sory, not as principal. The *allegata et probata* did not cor-respond, as required by all authority on the subject. Ros-coe's Crim. Ev. 649; Arch. Crim. Pl. 6, 382; *King* v. *Hughes*, 24 Eng. Com. Law R. 241; 1 Russell on Crimes, 30; 4 Black. Com. 36; Ib. 39.

Upon the question of the competency of the jurors, see *Commonwealth* v. *Knapp*, 9 Pick. 476. They could only state facts, not their opinions as to the merits of the case, &c.

The making up and rendering of a verdict on Sunday varies in no material respect from an inquest. 1 Strange, 387; 15 Johns. 177; and, therefore, from analogy it is void in this case.

In this State, in a criminal case the finding of the jury is a judicial act, they being made, by the statute, judges both of the law and the facts.

A verdict is like an award, and an award made on Sunday is void. *Story* v. *Elliot*, 8 Cowen, 31.

To the statement of counsel that this Court may now ren-der the proper judgment, we have a conclusive answer. The Revised Statutes, 188, § 198, only confer the power on this Court so to do, where the judgment is affirmed. In the present case, the judgment cannot be sustained.

The Opinion of the Court was delivered by

CATON, J.* Some of the questions presented in this re-cord are important in themselves; all are important from the nature of the case, and from the consequences which may flow from our determination.

It is assigned for error, that the Court overruled the de-fendant's motion for a continuance, and we will first inquire whether such decision can be assigned for error here. It is not pretended that it could be at Common Law. It is, how-ever, insisted, that that right is secured under our statute. The Common Law prescribes no given state of facts,

---

*YOUNG, J. did not sit in this case, and Justices THOMAS and DENNING were not on the Bench, when it was heard.

which shall entitle the party to a continuance in any case, but the whole subject is left entirely to the discretion of the Court to which the application is made. Our Legislature, by the Practice Act of 1827, enacted that a party should be entitled to a continuance of a cause upon filing an affidavit of certain facts, and yet this Court has held that an application for a continuance was still addressed to the discretion of the Court, and could not be assigned for error. *Vickers* v. *Hill*, 1 Scam. 308. This Practice Act, however, only applies to civil proceedings, and has never been held or supposed to apply to criminal cases. Had the Courts in all criminal cases required affidavits for continuances to be as full as required under this statute, it might, and would frequently have operated most oppressively upon prisoners.

In view of such hardships, the Circuit Courts have hardly considered it an intimation of what should be required in an affidavit for a continuance in criminal cases; most frequently feeling themselves called upon to continue cases, especially at the first term, upon affidavits not as full as required by the statute, very frequently feeling constrained to require affidavits still more explicit, and frequently requiring the defendant's affidavit to be corroborated. Indeed, it is manifest that it would be utterly impracticable to apply that statute to criminal cases, for that entitles a party to a continuance on his own affidavit alone, if it contains the necessary statements, and it is easy to perceive that many cases would never be tried. But this Act precribes the practice in civil common law cases only, and was most manifestly never intended to apply to any others, as this Court had repeatedly held, that exceptions could not be taken to the decisions of the Circuit Courts on motions for continuances and for new trials in civil cases.

The Legislature on the 21st of July, 1837, passed a law entitled "*An Act to amend An Act entitled "An Act concerning practice in Courts of Law,*" approved 29th January, 1827, in which it is provided that "exceptions taken to opinions or decisions of the Circuit Courts overruling motions in arrest of judgment, motions for new trials and continuances

of causes shall hereafter be allowed, and the party except-
ing may assign for error any opinion so excepted to, any
usage to the contrary notwithstanding."

In the Revised Statutes, this provision is incorporated into
the chapter prescribing the practice in civil cases, to which,
as originally passed, it was an amendment, and we are now
to inquire whether this statute applies to criminal cases.
We entertain no doubt that such was not the intention of the
Legislature, and that such is not its true construction. The
very title of the Act shows that it was only intended as an
amendment to a law, which had never been pretended, and
is not now pretended, to have applied to criminal cases.
Its provisions are totally inapplicable, and this, of itself,
would clearly show that the Legislature had in view civil
cases alone. As a further proof that it was not intended to
apply the general Practice Act to criminal proceedings, we
see that the Legislature has, in the sixteenth division of the
Criminal Code, gone on and fully prescribed a system of
practice for the Courts, when administering the criminal
law, and in that division, by the 188th section, it is express-
ly declared, that "all trials for criminal offences shall be
conducted according to the course of the Common Law, ex-
cept when *this chapter* points out a different mode, and the
rules of evidence of the Common Law shall also, unless
changed by *this chapter*, be binding upon all Courts and
juries in criminal cases. Juries, in all cases, shall be the
judges of the law and the fact." The whole course of our
legislation distinctly indicates an intention to maintain an
independence between the civil and criminal jurisdiction and
practice, as much as between those of the Common Law and
Chancery. For each, the Legislature has established a dis-
tinct code, and the wisdom of that distinction cannot be
doubted. We have a precedent of the highest authority for
not applying the provisions of this statute to criminal cases.
Anciently, no error could be assigned, except for an error in
law, apparent upon the face of the record itself; to remedy
this hardship, bills of exceptions were invented, and, by the
Statute of Westminster 2d, it was provided: "When one

impleaded before any of the Justices alleges an exception, praying they will allow it, and if they will not, if he that alleges the exception writes the same, and requires the Justices will put to it their seals, the Justices shall do so; and if one will not, another shall: and if, upon complaint made to the Justices, the King cause the record to come before him, and the exception be not found in the roll, and the plaintiff show the written exception, with the seal of the Justices thereto put, the Justice shall be commanded to appear at a certain day, either to confess or deny his seal, they shall proceed to judgment according to the exception, as it ought to be allowed or disallowed." This statute has been held by the English Courts not to apply to criminal cases. Bacon says: "It seems agreed that no *bill of exceptions* is to be allowed in treason or felony, for the words of the statute are, *cum aliquis implacitatur coram aliquibus Justiciariis,* &c., and if such bills were allowed, it would be attended with great inconvenience, because of the many frivolous exceptions that might be put in by prisoners to delay justice: besides, in criminal cases, the Judges are of counsel with the prisoner, and are to see that justice is done him." 1 Bac. Abr. 528.

More substantial reasons might be assigned for restricting the statute now under consideration to civil cases. It was not denied on the argument, that a motion for a continuance must necessarily be addressed to the sound discretion of the Court to which it is made; but, then, it was insisted that still the defendant might take his exception, and ask this Court to examine and see if we think the Court below has exercised a proper discretion. Nothing could be more dangerous, not to say disastrous, both to the public and to prisoners, than the assumption of such a right by this Court. To the public, there would be great danger that the most hardened and unscrupulous offenders, regardless of every other consideration but procrastination and ultimate escape from the punishment which they are conscious they justly deserve, might perpetually delay justice; and to prisoners, there would be a still greater danger that applications for continuances would sometimes be overruled by the Circuit Courts, when the Judge

reflects that much of the responsibility is taken from his shoulders, and he enjoys the comfortable reflection that no ultimate injury is likely to befal the prisoner by his decision, if wrong, for in that event the Supreme Court may set him right, where he may suppose the final responsibility will rest; whereas, if he saw that his decision was final, he would pause and deliberate long, and throw every doubt in favor of the application, when he reflected that the whole of the solemn responsibility rested upon himself, and that if he erred, the error would be irretrievable. These considerations must afford the surest guaranty that the rights of the accused will be most scrupulously guarded by the Courts to which such applications are made. All who are conversant with the administration of criminal law must know, that it is impossible for the Appellate Court to have all of the circumstances before it to enable it to exercise a proper discretion which are palpable to the Circuit Court, and knowing this, it might be induced to affirm a decision which, but for the reflection that it might be reviewed by another tribunal, might possibly have been the other way.

Should we undertake to review such decisions, in all human probability, we should often reverse decisions, which were most manifestly correct to the minds of all who were possessed of all the circumstances, in view of which the decisions were made, and affirm others which were made in doubt, relying upon the hope of reversal if wrong.

We are well convinced, that the rights both of the public and of the accused, are much better secured by throwing the entire responsibility upon the Court below, and we cannot entertain a doubt of the wisdom of the Legislature, in leaving it where the common law left it, to the sound discretion of the Court, to whom the application for a continuance is made. Although now the Courts are not nominally of counsel with the defendant, it is still none the less their duty to vigilantly watch and see that all his rights are secured to him, and that injustice is not done him. It is not their duty to punish any, unless their guilt is clear and manifest. Although we are clearly of opinion that the decision

of the Court, on this motion for a continuance, is one which we have no right to review, still, we cannot refrain from saying that we are far from being convinced that the Circuit did not exercise a sound discretion in overruling it.

We will next inquire whether Leper was an impartial juror, for although it does not appear that he finally sat upon the jury and tried the case, yet as the prisoner may have been compelled to use a peremptory challenge to exclude him, we think he ought to be allowed the benefit of the exception, if the Court improperly decided him to be a competent juror. Although the books are full of cases deciding what shall, and what shall not disqualify a juror, yet the task of laying down a rule so clear and distinct as to leave no difficulty in its application in practice, is so difficult that it has never yet been accomplished. The difficulty consists in describing that condition of the mind, which the Courts have considered requisite to make an impartial juror, so that it might be comprehended by all. From the slightest imaginable impression conceived, from the most vague and unsatisfactory rumor, which hardly leaves a trace upon the mind, to the most positive and determined conviction, which defies all effort to shake it, there is an infinite variety of imperceptible shades, and the difficulty consists in describing the point between these two extremes, which shall render the juror incompetent, so that it may be understood alike by the Court who is to decide, and the juror who is to explain the nature and extent of his opinion or belief. Hence the variety of modes adopted by different Courts, in laying down the rule which should govern in determining the question. All seem to agree, that to disqualify a juror, he should have something more than a vague and indefinite impression, not founded upon facts, which are established in his own mind to be true, and yet that it is not necessary that he should have so far prejudged the case, that his mind is not still open to conviction. It seems sufficient, however, if the judgment of the juror is convinced; if his belief is established from facts, of the truth of which he has no reasonable doubt, of the guilt or innocence of the accused, or that

one party or the other should recover. Has the existence of certain facts been so established in his mind, as to produce conviction? If so, he is incompetent, for neither party should be put to the necessity of producing proof to move a preconceived opinion. If the juror is already able to respond to the question, if put to him, so as to satisfy his own conscience, "Is the prisoner guilty, or is he innocent?"—then he is incompetent; but if from not being convinced of the existence or non-existence of certain facts, he is unable to determine that question, then he is competent. Such seems to be the rule indicated by the several decisions, which have already been made by this Court. But there is much less difficulty in establishing than in applying the rule. This arises in a great measure from the want of a clear perception on the part of jurors, as to what in reality constitutes such an opinion, and from the difficulty which they experience in explaining, so that it may be fully comprehended, the true condition of their mind on the subject of inquiry. Most jurors, when first inquired of as to their opinions, have not been in the habit of carefully analyzing their minds on the subject, and the first answer which they give, especially to questions ingeniously framed to elicit a desired reply, may be very far from giving the true state of the juror's mind. Hence, it is not uncommon to observe during the examination of the counsel on either side, the most palpable contradictions in the expressions used by jurors in giving the extent of their opinions, and that too by men of intelligence and integrity. It often happens that a juror may suppose that his belief in the existence of a certain fact, will constitute an opinion, when in truth it may be necessary to establish a great many other facts, before the guilt or innocence of the party could be established. A man may be charged with murder, and a juror may have no doubt but the person alledged to be murdered, was killed, and that the accused killed him, and yet have no sort of an idea whether the homicide were justifiable, excusable or felonious. No one will pretend that such a juror has an opinion of the guilt or innocence of the accused. If such opinions were

to disqualify jurors, it would in very many, if not in a majority of instances, be utterly impossible to get a jury in these cases; yet it is not uncommon for juries, whose belief even extends no farther than this, to answer in the first instance that they have an opinion; so on the other hand, there are persons who suppose they do not allow themselves to form an opinion no matter what they may have heard, till they hear the facts sworn to, while in truth their judgments are all the time convinced one way or the other, while they are unwilling to acknowledge it, even to themselves. In such cases it often requires the closest scrutiny to detect the true state of the juror's mind, hence it frequently becomes necessary, in order to a full understanding of the case, for the Court, (after the counsel on either side have put such questions as they think necessary,) to go on itself and examine further, and thus endeavor if possible to get at the true state of the juror's mind. When first examined, Leper stated that he had formed and expressed an opinion from reports, a part of which he believed. When further examined, he stated that the opinion which he had formed, was on the hypothesis, that the rumors were true, only a part of which he believed; in fact, that he had no opinion, whether the rumors which he had heard were true or false, and that the opinion which he had formed, was not of a fixed and definite character. This juror the Court held to be competent to try the cause and very properly, for it is manifest that the mind of the juror had settled down upon no conviction, whether the prisoner was guilty or innocent; that was a question still undetermined in his own mind. This is not so strong a case as that of *Smith* v. *Eames*, 3 Scam. 76, and certainly no stronger than that of *Gardner* v. *The People*, Ib. 83, and comes precisely within the rule laid down by this Court in other cases.

The same remark would apply to another juror whose name is not given in the bill of exceptions, but as it nowhere appears whether the Court decided him to be competent or incompetent, it is not necessary to say more about him.

The objection that Sisson, one of the jurors who tried the

Baxter *v.* The People.

cause, became incompetent during the trial, may be disposed of in a few words.   He complained to the Court of being unwell, when the Court caused a pallet to be provided for him near the jury box, upon which he laid down during a portion of the time, and he states in his affidavit, that during the argument of one of the defendant's counsel, he had a chill, and for a time was in a sort of drowse, and thinks he did not comprehend fully the whole of the argument.   He understood all of the evidence, and all that was said by the two other counsel for the prisoner in their addresses to the jury.   This is by no means sufficient to disturb the verdict.   In case a juror becomes unable to go on with the trial, the Court, on ascertaining the fact, will either suspend the trial, or discharge him altogether and impanel another in his place, and commence the trial again.   But to establish the rule that, because some one of the jurors did not hear and comprehend everything which was said to them, the verdict shall be set aside, would endanger altogether too many verdicts, and would introduce an inquiry which would be most embarrassing in its consequences.   Besides, it appears from the prisoner's own affidavit, that he knew that the juror was asleep at the time, and yet called the attention of no one to the fact, and it does not appear that the Court or any one else observed or knew it.   I will not say that a case of this nature might not be presented so strong, as to induce the Court, in its discretion, to set aside the verdict for this cause alone, but it would have to go very far beyond the one which is now before us.

An exception was taken to the decision of the Court in allowing Gregg to testify, and as that decision is assigned for error, it becomes necessary to dispose of it, although it was not insisted upon in the argument.   He swore that he assisted in the arrest of the prisoner, that a reward was offered by the State and the young Davenports for the arrest and conviction of the murderers of Col. Davenport, that he has received the reward offered by the State, but that he had received nothing from the young men and had not ex-

pected to receive anything from them; the Court properly decided that the witness was competent.

We will next inquire whether the Court erred in giving or refusing instructions. On this branch of the case, the only question worthy of consideration, arises upon the refusal to give the sixth, seventh, eighth, ninth and eleventh instructions and in the qualification given to the tenth. All the other instructions asked for by the defendant's counsel were given, and no question was made on the argument, and none can be made, but that the other instructions given were proper, and such as were calculated to aid the jury in arriving at a correct determination, in case it shall be found that the Court decided correctly in overruling the above mentioned instructions for the prisoner.

The instructions refused shall be disposed of in their order. The sixth instruction, as asked for by the defendant, was as follows: "If the jury believe, from the evidence, that an intention existed on the part of other persons, and who actually committed the murder, in the indictment charged, to rob the house of the person murdered, on a particular night, and to do the same against all opposition, and the prisoner not participating in the same intention, but being advised of such plan and intention, under a real subsisting fear of his life, from existing actual threats of the same, which sufficiently showed that his life was in danger, advised and procured the putting off of the same robbery until a time when there was no probability of loss of life being the the consequence of such robbery, and in doing the same, acted with a *bona fide* intention of preventing such and every murder, and under such then existing fear, founded upon actual threats made of his life if he exposed such other persons, he is not guilty of the murder, although he afterwards knew of and permitted such robbery, under circumstances when murder could not reasonably arise out of the same robbery, if the prisoner, during the period of the same acts, acted under the influence of such subsisting fear that his life would be taken if he acted otherwise." This in-

struction was refused because it was unintelligible to the Court, and most properly. When instructions are so drawn, either from carelessness or design, that they will be more likely to mislead than instruct a jury, although after careful study and investigation, we may be able to extract a correct principle of law from them, it becomes the undoubted duty of the Court to refuse such instruction. The object of instructions is to convey to the minds of the jury correct principles of law, as applicable to the evidence which has been laid before them; and nothing should be given them unless it will promote that object. Such was not the character of this instruction. Had it been given, it would have tended to confuse and mislead, rather than to have directed and enlightened them, and it would have been improper, if not error to have given it. Instructions ought not to be given unless they may be fairly understood and easily comprehended by the jury. The same principle which was probably aimed at by this instruction, is embraced in the tenth instruction, which is intelligible, and which will be noticed hereafter.

By the seventh, eighth, ninth and eleventh instructions, the Court is substantially asked to instruct the jury, that if the evidence shows the defendant to be guilty as accessory before the fact, that he cannot be convicted under this indictment for murder. The correctness of the decision of the Court in refusing to give these instructions, must depend upon the construction of our statute. By the thirteenth section of the Criminal Code, it is declared: "An accessory is he or she who stands by and aids, abets or assists, or who not being present, aiding, abetting, or assisting, hath advised, or encouraged, the perpetration of the crime. He or she who thus aids, abets or assists, advises, or encourages, shall be deemed and considered as principal, and punished accordingly;" and the inquiry is, whether proof that the prisoner was accessory to the crime before the fact will sustain an indictment against him as principal. The Act says that such accessories shall be deemed and considered as principals and punished accordingly. This Act, then, makes all accessories at, or before the fact, principals. The declaration

that they shall be "deemed and considered," is as unequivocal an expression as if the Act had said, "are hereby declared to be." It is true, the Act states what an accessory is, but then it declares in substance that he is principal. It was in perfect harmony with the system pursued by the Legislature, to go on and define what an accessory is, as it has defined all other offences, which it has attempted to enumerate, and it does not detract from the force of the provision, that they shall be deemed and considered as principals. The distinction between accessories before the fact, and principals, is in fact abolished. At the Common Law an accessory at the fact might be indicted and convicted as principal, for the Common Law declares that he who stands by, advises and encourages the murderer to give the blow, gives the blow himself as much as if he held the weapon in his own hands.

Our Legislature has gone one step further, and provided, that he, who not being present hath advised or encouraged the giving of the blow, hath given the blow as much as if he had stood by and encouraged it, or even had struck with his own hands. It is no more a fiction of law to declare that he gives the blow, by advising and encouraging it beforehand, than it is to affirm that he gives it by advising and encouraging it at the time. Both proceed upon the principle that what we advise or procure another to do, in the eye of the law we do ourselves. All are principals, and as such, should be indicted and punished. Indeed they must be indicted as principals or not all, for they are declared by the Act to be principals. If they are not to be indicted as principals, the very object of the law is defeated; if they are to be indicted as accessories, they must be tried and convicted as accessories, and then they could not be tried till after the conviction of the principals, for as we have before seen, we are bound by the rules of evidence of the Common Law, of which that is one. Such is the inevitable consequence, unless they are indicted and tried for murder, of which the statute says, they shall be deemed and considered guilty. There is no doubt but that the pleader may, if he choose,

and perhaps it would be advisable to describe the circumstances of the offence as they actually transpired, as it is in an indictment against an accessory before or at the fact; but if the stating part of the indictment be that way, it should conclude as for murder, for that is really the offence of which the party is guilty, if at all. It was urged, that there was a variance between the proof and the allegations. That is true in one sense, and so it is true of an indictment for murder against an accessory at the fact; so it is true of an indictment for larceny against a clerk, an apprentice, a bailor, or a lodger for embezzlement, which is declared by our statute to be a larceny, and they are always indicted as for stealing, taking and carrying away, in the usual form. They are charged with a felonious taking, when in truth, it is only a felonious conversion, and yet it is held there is no variance, for the law declares in effect, that the felonious conversion shall make the original taking felonious, although it were lawful at the time.

Then, as by the law in this case, the acts of the principal are made the acts of the accessory, he thereby becomes the principal, and may be charged as having done the acts himself. He shall be deemed and considered as principal, and be punished accordingly. The Circuit Court decided correctly in refusing these instructions.

The tenth instruction asked is as follows: "If the jury believe from the evidence, that the defendant only consented to the robbery of the house of George Davenport, and not to his murder, and that the defendant at the time of giving such consent, had reasonable cause to believe that his life would be immediately taken unless he gave such consent, then the law is, that the defendant is not guilty." This instruction was given with the very proper qualification, "unless they further believe that he subsequently consented, advised, aided, abetted, or assisted in the robbery." It hardly requires an argument to prove, that if the prisoner, after the immediate danger had passed away, (if any such ever existed,) consented, advised, aided, abetted or assisted in the robbery, that he was as guilty as if such danger had never threatened him.

The trial was commenced on Friday, and the case submitted to the jury late on Saturday evening. After twelve o'clock, they came into Court, and the foreman delivered a verdict of guilty; but upon being polled one of the jurors stated, that he did not find the defendant guilty in manner and form as he was charged in the indictment, when they returned, and subsequently, on the same day, being Sunday, they returned with a verdict of guilty. Motions were made for a new trial, and in arrest of judgment, which were over-ruled by the Court and sentence pronounced. Errors are assigned on all of these various proceedings. Had the Court a right to receive the verdict and pronounce judgment on Sunday? That Courts have no right to pronounce a judgment, or do any other act strictly judicial on Sunday, unless expressly authorized by statute, seems to be too well settled to admit of a doubt by the decisions in England and in this country. The leading case on this subject, is that of *Swann* v. *Broome*, 3 Burrow, 1595, where it was held by the Court of King's Bench, that the Court could not sit on Sunday and give a valid judgment, it not being a judicial day. It appears that anciently among the christians, Courts did sit on Sunday, but by a canon of the Church, made in the year 517, this was prohibited, and that rule seems to have been adopted into the Common Law, and may be considered as well settled. But this prohibition seems to be confined to the entering of judgments of record, and other like judicial acts, for we learn from the opinion of Lord Mansfield in the same case, that it was assigned for error in the Exchequer, "that the information (for engrossing butter and cheese contrary to the statute,) was exhibited to the Court on the 13th day of October, which in the year (20 Jac. 1,) was on Sunday, and therefore not "*dies juridicus.*" But it was held by Hatton and Jones that it was good, for although it was not *dies juridicus*, for the award of any judicial process, or to make an entry of any judgment on record, yet it was good for accepting an information on a special law;" and the judgment was affirmed by the whole Court. The question seems to have been frequently before the English Courts, and the Courts of most of the States of the Union, and the decisions

are very uniform, that a judgment cannot be entered of record on Sunday. See 5 Coke, 66; 1 Strange, 389; 13 Mass. 347; 5 Blackf. 111; 6 Ala. 200; 4 N. Hamp. 158; 2 Bibb, 589; 8 Cowen, 27; 1 Wend. 57. The cases all show that a judgment entered of record on Sunday is not only erroneous, but is absolutely void.

But although the law seems to be well settled, that a judgment cannot be entered of record on Sunday, yet I think it equally well settled that a verdict of a jury may be entered of record on Sunday. I have already referred to a case, where a presentment made on Sunday was held to be good; and in the case of *Harrington* v. *Osborn*, 15 Johns. 119, the Court say: "It was proper to receive the verdict on Sunday, presuming the jury were impaneled before Sunday commenced, but it was illegal to render the judgment on Sunday." In *Butler* v. *Kelsey*, Ibid. 178, the Court set aside an inquisition because it was taken on Sunday. They say: " It is not like the case of a trial at the Circuit, where a verdict is sometimes taken on Sunday morning, because the jury must otherwise be kept together during Sunday." In *Story* v. *Elliot*, 8 Cowen, 27, the Court held that an award of arbitrators made and published on Sunday, was void upon the ground that an award is a judicial act of a tribunal of the parties' own choosing, and is conclusive when fairly and legally made, from which there is no appeal. In that case, Ch. J. Savage quotes, with approbation, the language of Yates, J. in the case of *Van Cortland* v. *Underhill*, 15 Johns. 416, where he says: "It certainly would be a dangerous innovation to place them, (awards,) on a footing with the verdict of a jury." In 3 U. S. Dig. 635, § 220, it is said: "A verdict returned on Sunday is void, and a new trial will be granted." And the case of *Shaw* v. *McCombs*, 2 Bay, 232, is referred to. I find the same case referred to in Comyn's Digest, as supporting the same principle. Such is the decision in that case, but the Opinion of the Court indicates that it was made without a very thorough examination, or much reflection; not an authority is referred to, nor a reason given, except that Sunday is not a judicial

day. I have not been able to find but one other case or reference asserting such a principle, and in the same section in the U. S. Dig. we are referred to *Huidekoper* v. *Cotton*, 3 Watts, 56, and *Van Riper* v. *Van Riper*, 1 South. 156, as holding the contrary rule. We have not access to either of these references, but presume they are correctly quoted. In the case of *Nabois* v. *The State*, Ala. 200, a verdict was set aside which was received on Sunday, principally upon the ground that the term expired at twelve o'clock, on Saturday night; although the circumstances of that case are like those of the one before us, yet we cannot agree with that Court in its conclusions. We think the authorities clearly establish that when a cause is submitted to the jury before twelve o'clock on Saturday night, the verdict of the jury may be received on Sunday; but that it is not a judicial day for the purpose of rendering any judgment, and if it attempt to render a judgment, still, in law, it would be no judgment, but absolutely void, and will be so declared, and may be reversed by this Court: not that such reversal will take from it any force or vitality, for it never had any, not having been rendered by a Court having authority to render any judgment whatever at the time.

There is another question still remaining not less important than any of the others, and that is, what is to be the effect of the reversal of this judgment? It is laid down in 1 Chitty's Crim. Law, 755, that "when a judgment is erroneous, that it and all former proceedings, in case of a conviction, are defeated by a reversal," and the same rule is laid down in 2 Hawk. P. C. 655; and in 3 Comyn's Digest, 568, it is said: "A judgment in a criminal case must be affirmed or reversed altogether; it cannot be affirmed or reversed in part." In the case of *Rex* v. *Ellis*, 11 Eng. Com. Law R. 257, it was held, where the prisoner had been sentenced to transportation for fourteen years, when the law authorized only seven years, the judgment was held erroneous, and reversed. It was further determined that it could not be remanded, and the prisoner was discharged. In the case of *King* v. *Bourne*, Lord Denman, C. J. says: "This is a writ of error upon a judgment of transportation passed

on three persons, none of whom was subject by law to any but capital punishment. In that case, it was contended that the Court might either render the proper judgment, or remand the case for the Court below to render such judgment, as the law required. The Court decided that it could do neither. The Chief Justice says: "We cannot say that the Court below has given no judgment; if it had been so, and the case had merely come before this Court for the purpose of obtaining its opinion, we might have heard the point discussed, and remitted the case again to the Court below for judgment." The judgment was reversed, and the prisoners discharged. These cases seem to establish the rule, that when a judgment has been pronounced in a criminal case, by a Court of competent jurisdiction, and having full power at the time to pronounce judgment, it gives an erroneous judgment, that may not only be reversed, but also the verdict, and all antecedent proceedings, which were entirely regular in themselves. But if no such judgment has been given, then the cause may be remanded for a proper judgment. Such is distinctly decided to be the law in the case of the *King* v. *Kenworthy*, 8 Eng. Com. Law R. 196. There the defendant was convicted of perjury, and, after the entry of the verdict, the record proceeded as follows: "Whereupon, all and singular the said premises being seen by the said Justice here, and fully understood, it is thereupon ordered that the said Lawrence Kenworthy be transported to the coast of New South Wales, or some one or other of the islands adjacent, for and during the term of seven years, and that he, the said L. Kenworthy, be in mercy, &c." The record was removed into the Court of King's Bench, and various errors assigned, and it was held not to be a sufficient judgment, and for want of a judgment in the Court below, the cause was remanded, with an order to that Court to proceed and give judgment on the conviction. If these cases are to be considered as indicating what the law is, then it is to be determined whether a judgment which is void, being pronounced by a tribunal not having authority to pronounce any judgment at all, be in law a judgment. The very state-

ment of the proposition is sufficient to show that it is not. We have already seen that the Court has no right and no jurisdiction to proceed to judgment on Sunday. Suppose, after this verdict had been received, and the Court adjourned to the next term, the clerk had entered up a judgment, that could have been no more than a void judgment, and no more void than this; or suppose, after this verdict had been received, the cause had been continued to the next term for judgment, and the Court adjourned, and that some time during the vacation, and without appointing a special term, through some misapprehension, the Judge had opened Court and rendered judgment, such a judgment would have been a nullity, but no more so than this. This last is not entirely an imaginary case, for a term of the Cook Circuit Court was once held, after the time for holding that Court had been changed, the law making the change having passed the Legislature but a few days before the Court was held, and not yet known there. This Court held, that every thing that was done at that term was absolutely void. *Galusha* v. *Butterfield*, 2 Scam. 227; *Archer* v. *Ross*, Ib. 303, and note. Suppose, then, that a prisoner had been convicted at a previous term, and the verdict recorded, and continued till the next term for judgment, and the Court had gone on and rendered judgment at that term, can any one suppose that such void judgment could vitiate the verdict and all antecedent proceedings? A void judgment, powerless for good, cannot be potent for evil.

But counsel seem to think that, *Arthur* v. *Mosely*, 2 Bibb, 589, is an authority directly in point, showing that where the verdict is received, and judgment pronounced on Sunday, both will be reversed, yet such is not the case. There, a part of the evidence was heard, and the cause submitted to the jury on Sunday, as well as the verdict received and the judgment entered on that day. The trial of the cause being a judicial proceeding, of course could not be done on Sunday, which is admitted on all hands not to be a judicial day. There, the judgment was reversed, the verdict set aside and the cause remanded. It is also urged in this case, that, al-

though no part of the trial took place on Sunday, yet as the
record shows that the jury deliberated and finally agreed
upon their verdict on Sunday, for that reason it was illegal
and void, because the jury were the judges of the law as
well as of the facts, their deliberating and agreeing upon
their verdict was a judicial act, and, hence, void. The ob-
jection cannot prevail. If it could, all verdicts in criminal
cases, where the jury are kept together over Sunday, and
their verdicts received on Monday morning, would have to
be set aside, if it could be established that they agreed upon
their verdict, or even deliberated on the case on Sunday, for
their deliberation would be as objectionable as their agree-
ment.

Although the decisions of the motions for a new trial, and
in arrest of judgment, being judicial acts, were also void,
and those motions may be again urged by the prisoner, if he
shall be so advised, yet we feel it our duty to state, that he
may not be beguiled into a groundless hope, that what has
been already decided, disposes of the one, and we have been
unable to discover any grounds for the other.

The judgment of the Circuit Court is declared to be abso-
lutely null and void, and the cause is remanded, with a *pro-
cedendo* to that Court, to render the judgment of the law
upon the verdict of the jury.*

KOERNER, J. delivered the following dissenting Opinion:

In dissenting from the Opinion of the majority of the
Court, I deem it proper to assign briefly the reasons for so
doing.

The Common Law recognizes three different degrees of
guilt in the commission of a *felony*, (high treason excepted,)
where several persons participate: 1. The principal in the

---

* The Legislature, soon after this decision was pronounced, passed an Act
changing the punishment in this case from death to imprisonment in the Peni-
tentiary for life, should the plaintiff in error at the next term of the Warren
Circuit Court, after sentence was again passed upon him, assent to such change.
His assent was given at the time stated.

first degree; 2. The principal in the second degree; 3. The accessory before the fact.

The first was he who actually committed the felony; the second he who was *present* at the act, aiding and abetting; the third he who, *not being present*, had encouraged or advised the commission of the felony.

Principals in the second degree (accessories at the fact,) could not be tried, as the Common Law originally stood, until the principal had been convicted or outlawed; (Foster, 347;) but, at a later period, they could be arraigned and tried before the principal in the first degree had been found guilty. 2 Hale, 223.

At Common Law, an accessory before the fact could not be tried without his own consent, (unless tried with the principal,) until the guilt of his principal had been legally ascertained by conviction or outlawry. When principal and accessory were tried together, the jury were charged to inquire first of the principal, and if they should not find him guilty, to acquit the accessory; but if they should find him guilty, then to inquire of the accessory. 1 Hale, 624.

At Common Law, the accessory before the fact cannot be indicted as principal; and though the offence of an accessory before the fact is felony at Common Law, yet such offence is not punishable with death, unless it be so expressly provided by statute. Archb. Crim. Pl. 646.

I will now consider how far the Common Law, upon this subject, has been changed by our statute.

The thirteenth section of the Criminal Code of Revised Laws, 1845, page 153, reads as follows: "An accessory is he or she who stands by and aids, abets or assists, or who, not being present, aiding, assisting and abetting, hath advised and encouraged the perpetration of the crime. He or she, who thus aids, abets or assists, advises or encourages, shall be deemed and considered as principal, and punished accordingly." I will remark here, that our statute sets out with defining the offence of an accessory with much precision, which would have been useless if it had intended to treat them in every respect as principals. If such had been

the object, it would have been sufficient to have said, all accessories before and at the fact shall be deemed guilty of having committed the offence of which the principal is charged.

This section certainly establishes the distinction between principals in the second degree and accessories before the fact. It also, by necessary implication at least, does away with the principle, that an accessory cannot be tried, except on conviction or outlawry of the principal. It also enacts that, in all cases, the punishment shall be the same which is provided for the principal. Here, then, are obvious and important changes wrought in the Common Law by our statute, and an ample meaning is given to almost every letter of it.

There seems to be no necessity whatever for still enlarging its operation, by further implication, beyond what is plainly meant by it. It being in derogation of the Common law, it ought not to receive a latitudinarian construction. The statute does not say that accessories shall be indicted and proceeded against in every respect as though they were principals, but merely that they shall be punished as principals. It does not mean, in my opinion, that an accessory may be charged as having actually, with his own hands, committed the crime. If this legal fiction is allowed, one may be charged in an indictment with having murdered another, on a certain day, at a certain place in the State of Illinois, by discharging a pistol, then and there by him in his right hand held, and may be convicted upon proof that the murder was committed by a third person, whose name he may never have heard, and while he, the accused, was a thousand miles off, provided he have advised and encouraged such murder before it was perpetrated, although he remains wholly ignorant of the precise time when he is accused of having given the encouragement.

If by such proof under the simple charge of actual murder, the accused is not taken by surprise, in a legal sense at least, then indeed I do not know what is meant by a party being taken by surprise. The 9th section of the 8th Art. of

our Constitution provides, that the accused in all criminal prosecutions shall have a right to demand the nature and cause of the accusation against him. Does an indictment, as is preferred in the present case against Baxter, who is established to have encouraged the crime before its commission, comport with the spirit of this provision? I think not. I am of opinion that when a person is supposed to be guilty as an accessory before the fact, the indictment must charge him accordingly. It must set forth the commission of the crime by the principal, and then charge him with having advised and encouraged the perpetration of the offence. It would indeed be very desirable for Legislatures to provide for the preferring of criminal accusations in plain and intelligible language, so that the accused might comprehend the "nature and cause" of his charge, without being an adept in the doctrine of fictions. It is time that indictments should be divested of the barbarous and unintelligible jargon, with which they still abound.

The question respecting the propriety of indicting an accessory before the fact as principal, is presented by several instructions which were asked by the defendant's counsel. These instructions were refused. In my opinion they ought to have been given, and I think this error is well assigned.

There is another point in which I have the misfortune to differ with the majority of the Court. The Court held, that Sunday, by the Common Law of England, is not a judicial day, and that this portion of the Common Law is applicable to our institutions and the condition of our people. Be it so. The reason of this rule certainly is, that Sunday being set apart as a day of rest, and for purposes of public worship, it would be wrong to permit public officers to exercise their functions, which would, in many instances, defeat the objects which temporal and spiritual governments had in view, in in thus setting apart one day in the week. The distinction which seems to have been drawn by some Courts between ministerial and judicial acts, and that the former may be lawfully done, but not the latter, appears to me to have no foundation in reason; it is an ingenious device for upholding

certain legal acts, which it would have been inconvenient to set aside. The devotions of the public are certainly as much interrupted by the execution of a criminal, as by an assessment of damages before a sheriff in his office, and yet the first, according this distinction, could be legally done, while the assessment, made on Sunday, would be a nullity.

There are authorities which lay it down as law, that a verdict may be received on a Sunday, when it appears that the jury was impaneled on Saturday previous. It seems to me, however, that these decisions proceed upon the principle, that the Court will presume in such a case that the verdict was actually found on Saturday, and merely delivered on Sunday, which delivery may be said to be a mere mechanical act. In 2 Bay, 232, it was held, that no verdict whatever can be received on Sunday.

In the present case the record shows, that the verdict was actually found on Sunday. The jury were impaneled on Saturday, brought in a verdict on Sunday, but having been polled, would not stand to it. They then went back to consider, and on the same day returned the verdict upon which sentence was pronounced. And is it to be said that the solemn finding of a verdict, upon full deliberation, affecting the life of a human being, by a jury, who by our Constitution are made the judges of law as well as of fact in criminal cases, is a mere ministerial act? An award made by arbitrators on a Sunday, it is said, is void, but a verdict finding a citizen guilty of murder, is valid.

But admitting that it were legal to receive a verdict on Sunday, but illegal as the Court say, to pronounce judgment, what are the consequences of the reversal of the judgment? By the Common Law, when a judgment in a criminal case is erroneous, all former proceedings in case of conviction are defeated by the reversal. 1 Chitty's Crim. Law, 755. It is said, however, that there is a difference between a judgment which is erroneous, and one which is void. I am at a loss to comprehend this distinction. If, in the present case, the Court had sentenced Baxter to be shot, instead of being hung, he would have been entitled to a new trial; but

as he was sentenced to the proper punishment, but on a wrong day, the verdict must stand. I cannot accede to this reasoning. I presume, however, that the Court does not wish to be understood as deciding, that the decisions of the Court in overruling a motion for a new trial and in arrest of judgment, are also to stand, for they surely were judicial acts; and that the prisoner will be entitled to renew his several motions.

In declaring this judgment as utterly void, and of no effect whatever, it seems to follow, that if Baxter had not taken the appeal, and had been executed, the sheriff would have been guilty of murder, as he then would have acted without any authority whatever. But I will not pursue this inquiry any further, and will conclude by stating that I believe that a verdict found on Sunday in a criminal case cannot be received, it being a judicial act, upon the assumption that judicial acts are void; and that even if such verdicts could be received, they would have to be set aside, if sentence were pronounced upon them on Sunday, upon the well established rule, that if a judgment in a criminal case is reversed, all previous proceedings must also be reversed.

*Cause remanded.*