THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* VINCENT WASHINGTON, Defendant-Appellant.

First District (5th Division)    No. 80-1215

Opinion filed February 5, 1982.

Thomas F. Geraghty, of Northwestern University Legal Clinic, of Chicago, and Eric Nelson and Martin Diestler, law students, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Warren A. Zimmerman, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant was convicted of rape and deviate sexual assault, and he was sentenced to 10 years imprisonment. On appeal he raises the following issues:

(1) whether the trial court abused its discretion in conducting the examination of prospective jurors;

(2) whether the trial court committed reversible error by denying a challenge for cause of a prospective juror;

(3) whether the trial court erred by not passing upon and accepting jurors in panels of four;

(4) whether foundational questions asked of the complainant were sufficient to permit impeaching her with evidence of a prior inconsistent statement;

(5) whether the trial court improperly restricted the direct examination of the defendant;

(6) whether the evidence is sufficient to prove defendant guilty beyond a reasonable doubt; and

(7) whether the trial court abused its discretion in sentencing defendant.

The following evidence is material to our decision.

Cecelia E. testified that on March 4, 1979, at about 3:15 a.m., she and Alton Ratcliff left a tavern near 68th and Halsted, in Chicago, and started walking north on Halsted to a restaurant. On the way to the restaurant they encountered three men, and Alton asked them if the restaurant was open. One of the men said that the restaurant was closed, so Cecelia and Alton turned around and started walking south on Halsted. The three men followed as they walked to 67th and then over to Emerald. Cecelia also testified that while they were following her and Alton, "They were cussing and they were making jokes and stuff about me."

Cecelia further testified that when the group turned the corner at 67th and Emerald, on the west side of Emerald, defendant knocked Alton to the ground, and one of the other men knocked her to the ground and started ripping her clothes off. While defendant struggled with Alton, the man who ripped her clothes off raped her. When one of the men "hollered" that they couldn't rape her out in the open, defendant helped one of the other men drag her across the street to a church on the east side of Emerald. Defendant raped her while she was lying in the snow in front of the church and, at the same time, the other men forced her to engage in oral sex. When defendant finished raping her, one of the other men raped her, and then, "All of a sudden, I noticed they started running, the police was there."

Defendant testified that he did not rape or commit deviate sexual assault on Cecelia. Although defendant admitted that he was highly intoxicated on the night of the attack, he testified that he was simply following some friends when he saw his friend Andre Tylon swing at Alton. Defendant started hitting Alton because Alton was bigger than

Tylon, and when Alton fell to the ground defendant started kicking him.

Defendant testified that he saw his friend Farrell Hunter pulling Cecelia off the curb, and he also admitted seeing that her blouse was torn. But defendant said that he fell on top of Alton and they struggled for several minutes until Alton got up and ran away. When Alton ran away, defendant heard Cecelia screaming on the other side of the street. When he crossed the street, defendant saw his friend Hunter raping Cecelia and his friend Tylon kneeling at her head. Although defendant denied raping Cecelia, he admitted standing two or three feet from her for "about ten or fifteen seconds" while she was being attacked by his friends. After defendant stood there for "about ten or fifteen seconds," the police arrived, and he ran away.

Additional evidence is discussed below where pertinent.

Opinion

I

The initial question is whether the trial court abused its discretion in refusing to ask proposed questions which the defense submitted for the *voir dire* of prospective jurors. The trial court conducted examination of the prospective jurors, and the defense argues that the court abused its discretion by refusing to ask the defense's proposed questions in the following instances:

(a) Although the trial court asked prospective jurors about their present jobs, and the jobs of the members of their immediate families, the court did not ask the proposed question "What other types of jobs have you had?"

(b) Although the trial court questioned prospective jurors about prior jury experience, they were not asked a proposed question about how they felt about their prior jury experience and whether it left them "with any prejudices or cynicism regarding the judicial system."

(c) Although the trial court asked prospective jurors if they, or any close friends, or relatives had been the victim of any crimes, the court did not ask a proposed question about whether any of the prospective jurors knew *anyone* (*e.g.*, a neighbor who might not be a close friend) who had been the victim of a crime similar to the crimes involved in this case.

(d) Although the court asked the prospective jurors if there was anything about the crime charged which would prevent them from being fair and impartial jurors, the court did not ask a proposed question about whether they had ever worked in a hospital emergency room or a rape counseling service.

(e) Although the court asked prospective jurors whether they had any bias or prejudice against people who drink alcoholic beverages, and

whether they had "any bias or prejudice against a person simply because he may be charged with a crime or because of his race, creed, color, nationality or religion," the court did not ask proposed questions about attitudes towards teenagers, and towards people with defendant's background.

(f) Although the court recited the applicable principles of law concerning the presumption of innocence and the prosecution's burden of proof, and asked the prospective jurors whether they agreed with the rules of law, the court did not ask the more extensive series of proposed questions concerning these legal principles. Additionally, the court did not ask the proposed questions about attitudes towards accountability, and identification evidence.

It is unquestionably true that one of the most priceless safeguards of individual liberty is the right to trial by a panel of impartial jurors. (*Irvin v. Dowd* (1961), 366 U.S. 717, 721, 6 L. Ed. 2d 751, 755, 81 S. Ct. 1639, 1642.) "The purpose of a jury is to guard against the exercise of arbitrary power—to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge." (*Taylor v. Louisiana* (1975), 419 U.S. 522, 530, 42 L. Ed. 2d 690, 698, 95 S. Ct. 692, 698.) And the purpose of *voir dire* examination is to filter out prospective jurors who are unable or unwilling to be impartial. *United States v. Liddy* (D.C. Cir. 1974), 509 F.2d 428, 434, *cert. denied* (1975), 420 U.S. 911, 42 L. Ed. 2d 842, 95 S. Ct. 833.

In every case it can be argued that the effectiveness of *voir dire* examination, as a procedure for filtering out partial jurors, increases with the extensiveness of the *voir dire* questioning. But there is no precise technical test for determining whether a prospective juror will have the appropriate degree of impartiality. (*United States v. Wood* (1936), 299 U.S. 123, 145-46, 81 L. Ed. 78, 88, 57 S. Ct. 177, 185.) Thus, both Illinois Supreme Court Rule 234 (Ill. Rev. Stat. 1979, ch. 110A, par. 234), made applicable to criminal cases by Rule 431 (Ill. Rev. Stat. 1979, ch. 110A, par. 431), and Federal Rule of Criminal Procedure 24(a) give trial courts broad discretion in determining the *voir dire* questions and procedures which are appropriate in a particular case. Because of this similarity, we find it instructive to examine Federal cases which have considered whether there has been an abuse of discretion in the conduct of *voir dire*.

"The standard for evaluating the district court's exercise of its discretion is whether the means employed to test impartiality have created 'a reasonable assurance that prejudice would be discovered if present.'" (*United States v. Delval* (5th Cir. 1979), 600 F.2d 1098, 1102.) "At a minimum, when requested by counsel, inquiry must be made into matters where the likelihood of prejudice is so great that not to inquire

would risk failure in assembling an impartial jury." *United States v. Dellinger* (7th Cir. 1972), 472 F.2d 340, 368.

When fairness requires *voir dire* examination in a particular area of potential prejudice, it can be sufficient to ask a brief, general question which focuses the attention of the prospective jurors on the area of potential prejudice. (See *Ham v. South Carolina* (1973), 409 U.S. 524, 527, 525 n.2, 35 L. Ed. 2d 46, 50, 49 n.2, 93 S. Ct. 848, 850-51, 849-50 n.2.) And it has been held proper for a trial court to use a procedure which involves general questions addressed to the entire group, and then follows up with individual questions of potential jurors who indicate that they might not be impartial. See *United States v. Liddy* (D.C. Cir. 1974), 509 F.2d 428, 436-37.

■■ There is no reasonable likelihood that potential jurors will have fixed opinions or biases concerning either identification evidence or the law of accountability. The court's decision to preclude *voir dire* examination on these topics did not risk failure in assembling an impartial jury. (Compare the present case with *People v. Murawski* (1954), 2 Ill. 2d 143, 147, 117 N.E.2d 88 (*voir dire* question about attitudes towards abortion required in an abortion prosecution) and *People v. Moore* (1972), 6 Ill. App. 3d 568, 571, 286 N.E.2d 6 (*voir dire* question about attitudes towards the insanity defense required where the defense was going to be raised).) Moreover, we find that the questions asked by the trial court concerning the other areas of potential prejudice were sufficient to provide reasonable assurance that prejudice would have been discovered if present. We therefore conclude that the trial court did not abuse its discretion in the present case.

II

■■ The defense contends that the trial court committed reversible error by not excusing a potential juror for cause. The potential juror, Venireman Padera, said that he believed that he could be a fair juror, but he also admitted, "I haven't sorted it out. I have very strong opinions about sexual offenders." The court continued with further questioning at side bar, and Padera admitted that he honestly didn't know if he could be a fair juror; he didn't know if his opinions about sex offenders would affect his judgment. After additional questioning by the court, Padera again said he believed he could be fair; but in response to a question from defense counsel, Padera admitted that, "I'm not sure I can be fair, no." In addition, when the trial court asked if he agreed that the prosecution should have the burden of proving guilt beyond a reasonable doubt, Padera equivocally answered that he "generally" agreed with that principle of law. Responding to that answer, the trial court explained the significance and importance of the differences between the criminal justice systems in the

United States and in Iran. Despite this explanation, Padera did not unequivocally state that he would be an impartial juror who would faithfully apply the applicable principles of law. Based on these facts, we find that it was manifestly erroneous for the trial court to conclude that this potential juror would be an impartial trier of fact.

It is argued that the error is reversible because the defense was forced to use a peremptory challenge to keep this potential juror from sitting on the jury. This seems to be the implicit holding of *Baxter v. People* (1846), 8 Ill. 368, where the supreme court held that it would consider the propriety of a ruling denying a challenge for cause, even though the record did not show whether the challenged individual actually sat on the jury, because the defense "may have been compelled to use a peremptory challenge to exclude him." (8 Ill. 368, 376.) However, in a more recent case the supreme court held that "[w]e can not reverse [a] judgment for errors committed in the lower court in overruling challenges for cause to jurors, even though [the] defendants exhausted their peremptory challenges unless it is further shown that an objectionable juror was forced upon them and sat upon the case after they had exhausted their peremptory challenges." *Spies v. People* (1887), 122 Ill. 1, 258, 12 N.E. 865; accord, *United States v. Tweed* (7th Cir. 1974), 503 F.2d 1127, 1129.

■■ In the present case, the defense exhausted its peremptory challenges, but it did not indicate to the trial court that it was being forced to accept an objectionable juror because of the error in overruling the prior challenge for cause. Notifying the trial court of this fact would have served the salutary purpose of giving the court a final opportunity to cure the alleged error by exercising its inherent power to grant the defense an extra peremptory challenge. Because the defense in the present case did not indicate that it was being forced to accept an objectionable juror as a result of the trial court's error, we hold that the error in denying the challenge for cause was waived.

## III

The defense argues that the trial court erred by not passing upon and accepting jurors in panels of four as required by section 21 of "An Act concerning jurors * * *" (Ill. Rev. Stat. 1979, ch. 78, par. 21). However, we find that this issue was waived because the defense never informed the trial court that it objected to the court's practice of using panels of 12.

■■ It is argued that the use of panels of 12 was announced by the trial court as a "fait accompli" and that it would have been useless to inform the court that there is a statutory right to insist on panels of four. We disagree because we find no reason for concluding that the trial court would not have used panels of four if its attention had been directed to section 21 by an appropriate and timely objection.

## IV

■■ The defense contends that the trial court prevented it from asking all the foundational questions which would have permitted it to impeach the complainant with evidence of a prior inconsistent statement. According to the offer of proof concerning the allegedly inconsistent statement, Cecelia told a police officer, soon after the attack, that she had been dragged across the street, forced to perform an act of oral sex, and then raped. It is argued that the officer's written summary of her prior statement is inconsistent with her trial testimony that she was raped while on the west side of the street and was raped again on the other side of the street while being forced to perform an act of oral sex at the same time. Even if this prior statement is inconsistent, the record shows that the defense simply abandoned its line of foundational questions when the court sustained an objection to a question that was not impeaching. Nothing in the record indicates that the court would have precluded further development of a proper foundation.

The defense refers us to *People v. Henry* (1970), 47 Ill. 2d 312, 265 N.E.2d 876, but *Henry* did not eliminate the requirement of asking foundational questions as a prerequisite of impeachment by prior inconsistent statement. Instead, the court in *Henry* merely held that there was sufficient compliance with the foundational requirements when a witness testified that she did not remember talking to the impeaching witnesses about a statement she had given to the police. Under the circumstances of that case, it was not necessary to ask the witness about the exact substance of the prior inconsistent statement.

■■ Unlike *Henry*, the witness in the present case acknowledged that she made a statement to the impeaching witness, and we find no reason for excusing compliance with the requirement of asking the witness whether she made the allegedly inconsistent prior statement.

We also conclude that the trial court did not err by not recalling the complainant on its own motion.

## V

The defense argues that the evidence is not sufficient to prove guilt beyond a reasonable doubt for the following reasons:

(a) According to the defense, "The record reflects that both complaining witnesses had been in a tavern drinking for four and one-half hours prior to this incident." The page in the trial transcript cited in support of this statement shows that Alton admitted that he was in a tavern for 4½ hours. And the next page in the transcript shows that Alton testified that he only had two beers and a shot of gin. This portion of the record does not even support a claim that Cecelia had anything at all to drink the night of the attack.

(b) Although Cecelia testified at trial that she and Alton were attacked by three men, a police officer testified that soon after the attack she said that she and Alton were approached by five men.

(c) At trial Cecelia testified, on direct examination, that Hunter raped her while on the west side of the street; that Hunter and defendant dragged her across the street; and that she was then raped twice while being forced, at the same time, to engage in oral sex. But on cross-examination she stated that she was raped three or four times while on the east side of the street.

(d) Alton testified that he was struggling with defendant while Cecelia was being dragged across the street by the other two men. This, of course, is inconsistent with Cecelia's testimony. However, the jury could have rejected part of Alton's testimony as inaccurate. In fact, we note that defendant was also charged with armed robbery based on Alton's testimony, but the jury rejected this portion of Alton's testimony, and returned a verdict of not guilty on the charge of armed robbery.

(e) Cecelia testified that she closed her eyes while she was forced to engage in oral sex, and she testified that, while on the east side of Emerald, she only saw defendant for three or four seconds. But in prior testimony, Cecelia estimated the time span for this observation as only two seconds. And, according to the defense, "No testimony was offered concerning [Cecelia's] ability to observe and identify [defendant] during the time of the walk from Halsted Street to Emerald. Thus, [Cecelia's] identification testimony is based on an alleged five second view of [defendant]." However, Cecelia testified that as the three men followed her, "They were cussing and they were making jokes and stuff about me."

(f) It is argued that the testimony Cecelia gave at the preliminary hearing was inconsistent with her trial testimony that defendant helped drag her across the street. At the preliminary hearing, Cecelia gave the following testimony:

"Q. [D]o you know which man knocked Mr. Ratcliff down?

A. The one in the red jacket.

Q. Mr. Washington?

A. Yes.

Q. What was the other man doing as Mr. Ratcliff was knocked down?

A. The one in the black jacket is the one who started tearing off my clothes, and he's the one that helped *another young man* drag me across the street." (Emphasis added.)

Since Cecelia had just referred to defendant as "[t]he one in the red jacket," it is argued that she would not have referred to defendant as "another young man" if he had helped drag her across the street.

(g) Finally, it is argued that Cecelia's credibility was impeached because, on cross-examination, she testified that the police pulled one of the rapists off of her. According to one of the arresting officers, the police did not pull any of the rapists off of her. However, we note that during her direct examination Cecelia testified that, "All of a sudden, I noticed they started running, the police was there." This, of course, was consistent with the allegedly impeaching testimony of the arresting officer. The "inconsistent" statement was elicited on cross-examination when Cecelia answered affirmatively to a leading question: "[W]hen the police arrived, did they pull one of the men who was on top off of you?"

As an appellate tribunal which did not have an opportunity to hear the witnesses testify, or to observe their demeanor, we are authorized to reverse a conviction only when the evidence is so palpably contrary to the weight of the evidence, or so unreasonable, or improbable, that we would be justified in disregarding the judgment of the jury and concluding that there is a reasonable doubt about defendant's guilt. *People v. Lobb* (1959), 17 Ill. 2d 287, 294, 161 N.E.2d 325.

In the present case, defendant was captured at the scene of the crime, and the victim identified him as one of the men who attacked her companion, helped drag her away, and who raped her while other attackers forced her to engage in oral sex. She testified that these men had followed her for several blocks, and she had reason to notice them because they swore and made jokes about her.

We find that the victim's testimony is not improbable, unreasonable, or palpably wrong. The fact that the victim of a gang rape did not repeat her testimony with the accuracy of a tape recorder does not necessarily create a reasonable doubt about defendant's guilt. The jury had an opportunity to determine whether the alleged impeachment of the complainant was actually impeaching and, if so, whether it was significant. The jury could have concluded that the victim was not absolutely accurate in every detail of her testimony but that, nevertheless, defendant was still guilty beyond a reasonable doubt.

Moreover, the jury was not obligated to believe defendant's testimony that he was only an innocent bystander. We recognize that defendant could not be held accountable if, as he testified, he merely stood by as an innocent bystander for "ten or fifteen seconds" while his friends attacked a screaming woman. But, even though it is not a crime to refuse to summon help for a crime victim, and even though it is not a crime to decline to try to stop a forcible felony, the jury was entitled to weigh the reasonableness of defendant's testimony when evaluating his credibility.

We conclude that the prosecution's evidence is sufficient to prove

beyond a reasonable doubt that defendant raped complainant and is accountable for the deviate sexual assaults which were committed during the rape.

## VI

The defense argues that the trial court erred in refusing to permit defendant to testify about whether he intended to rape Cecelia and whether he knew she was going to be assaulted. This issue was not raised in the post-trial motion, and we find that it was waived. See *People v. Irwin* (1965), 32 Ill. 2d 441, 443, 207 N.E.2d 76.

## VII

Although defendant was only 17 at the time the offense was committed, and had led an exemplary life, we find that, in light of the brutal nature of the attack in this case, the trial court did not abuse its discretion in sentencing defendant to 10 years in prison.

As the trial court stated, "If it had not been [such] a revolting offense he would have come in on the ground floor. It's so revolting that the court cannot sentence him to the ground floor and justify other sentences being [imposed] on other people. I haven't had a more aggravated rape in this court again in terms of brutality against the victim as I have had in this case. The court thinks the court is being considerate and had the witnesses not come in to testify [on behalf of defendant at the sentencing hearing] even without a background [*i.e.*, a criminal record] the court would assure you he would not have received ten years. He would not have received a sentence as low as ten years."

■■ We do not find that the trial court was predisposed to impose a sentence which exceeded the minimum. The brutal manner in which the crime was committed was sufficient to justify a sentence of imprisonment which is more than the minimum of six years imprisonment.

Based on the preceding reasons, the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.