THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* SHEILA DOLL, Defendant-Appellant.

Second District   No. 2—83—0594

Opinion filed July 27, 1984.—Rehearing denied August 30, 1984.

Mary Robinson, of Elgin, for appellant.

Robert Morrow, State's Attorney, of Geneva (Phyllis J. Perko and Cynthia N. Schneider, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE HOPF delivered the opinion of the court:

After a jury trial the defendant, Sheila Doll, was convicted of unlawful delivery of cocaine (Ill. Rev. Stat. 1981, ch. 56½, par. 1401(a)(2)). The Kane County circuit court sentenced her to six years' imprisonment in the Department of Corrections.

On appeal the defendant asserts that the trial court erred on the following points: (1) by excluding evidence that a defense witness had been offered leniency in exchange for not testifying on behalf of the defendant; (2) by allowing the State to make a misleading argument that this same defense witness, who had pled guilty on a related charge in a related case, gave inconsistent testimony in the present case; (3) by allowing certain arguments which may have led the jury to believe the defendant was involved in unrelated criminal activity; and (4) by restricting defense counsel's cross-examination of a State witness, Captain J. W. Smith.

On July 13, 1982, the defendant was indicted for unlawful delivery of more than 30 grams of a substance containing cocaine, a controlled substance, in contravention of section 401(a)(2) of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1981, ch. 56½, par. 1401(a)(2)). Rodney Nally, a defense witness, was indicted on three counts of the same charge arising from the same transaction. The State's motion to consolidate the Nally case with the present case was denied.

At trial Randall Kucaba, special agent with the Illinois Department of Law Enforcement, Division of Criminal Investigation, was the principal witness for the State. Kucaba testified that on the morning of July 13, 1982, he contacted Rodney Nally for the purpose of buying some cocaine from him. The parties agreed on a price of $2,775 and made arrangements to meet at a certain parking lot in Aurora at about 4 p.m. on the day in question. Agent Kucaba brought his partner, Theodore Rizo, with him and Nally indicated he would probably bring his brother, Ken.

Kucaba and Nally met at the parking lot at the agreed location, though Nally was late. Nally was driving a red 1974 Chevrolet and the defendant, not Nally's brother, was with him in the car. Kucaba

approached the vehicle and asked Nally where Ken was. Nally responded that Ken could not make it, so Sheila Doll came along instead.

Kucaba testified that he introduced himself to defendant and inquired if she was Nally's wife. Defendant responded that her name was Sheila and that she was Nally's "old lady." Kucaba then asked if Nally had brought the ounce and a quarter with him. Nally had the cocaine in a woman's cigarette case which he opened, and Kucaba could see a plastic bag inside. Kucaba explained that the quarter-ounce package was for him and the one-ounce package was for his partner, Agent Rizo, and that he wanted it in two separate packages. Nally glanced at Sheila Doll and Doll responded by saying something to the effect of "don't worry, there's two separate packages in there." Kucaba indicated he wanted a sample of the cocaine prior to purchasing. He testified that Nally told him not to worry, it was good quality, and Sheila Doll agreed, stating they had done a "line" before they came down to Aurora. Kucaba explained that doing a "line" means inhaling an amount of cocaine in the nose. Kucaba took the sample back to his vehicle, and Agent Rizo did a field test (chemical) of a portion of the sample. Kucaba returned to the vehicle and exchanged $2,775 in marked money for the cocaine.

As Nally was counting the money Kucaba inquired as to whether or not they would be able to purchase 10 to 12 ounces of cocaine from him in the future. Kucaba testified that Sheila Doll responded by saying, yes, they could; it would take them about one day to come up with that much cocaine. Nally agreed with defendant. Kucaba testified that after Nally finished counting the money he handed it to Doll, Nally shook hands with Kucaba and Kucaba walked away with the cocaine. No arrest was made at the time. Kucaba testified as to the chain of evidence and that the tests performed on the substance indicated that it did contain cocaine.

On cross-examination Agent Kucaba testified that he identified Sheila Doll through the license plates on her vehicle. The colloquy which followed this statement is the subject of an issue discussed in more detail below. Kucaba testified that he made no arrests at the time of the July 13 purchase because he wanted to try to set up a larger buy. However, he was unable to set up another purchase with Nally in the ensuing months.

Agent Rizo corroborated the Kucaba testimony. A forensic scientist testified for the State that the total weight of the powder was 34.2 grams and that test results indicated that the substance contained cocaine.

The postmaster for St. Charles testified that he knew Sheila Doll because she was a regular rural carrier with that office. Her work records for July 13, 1982, reflected that she came to work on that day but went home sick. A substitute filled in for her position. A copy of the work sheet for that date was admitted as an exhibit for the State.

Rodney Nally was the principal witness for the defendant. He testified that he had been convicted of delivering cocaine as a result of the transactions described by Agent Kucaba. He had known the defendant for nine years and had had an on-and-off relationship with her over that period of time. During the course of their relationship he had abused her on many occasions and caused her various injuries. When the defendant had attempted to break off the relationship, Nally admitted he would go into a violent rage. He indicated he was using cocaine quite often and drinking a lot. Nally testified he was also seeing a girl named Cheryl Vivarino during the time prior to the July 13 delivery. He testified that on the day in question Cheryl was going to come by his mother's house and pick him up and give him a ride. When Cheryl did not arrive he asked for a ride from Sheila, who had come to see Nally's sister. Defendant told him she would not let him use her car because she did not want Nally's sleazy girlfriends in her car. Nally said he was not going to do that and said she could come with him. Defendant indicated she would ride with him.

Nally testified that he drove the car on the trip to Aurora. He pulled into the parking lot at Gaylord's and got out of the car to get the cocaine out of the trunk where he had put it. After Kucaba came up to the car Nally gave him a sample of the cocaine. At this point, according to Nally, the defendant figured out what was going on and said she wanted to get out of the car and he could pick her up later at the shopping center. Nally testified that he grabbed her by the arm and told her to stay in the car. Nally then introduced the defendant to Agent Kucaba. However, he testified, prior to their arrival at the parking lot, she had no knowledge of the drug deal and did not participate in any of the conversations that took place during the time of the deal. Nally testified that when Kucaba inquired about the quality of the stuff he did not say that he and defendant had done a "line." Rather, he had used a needle and had "shot" some. Nally testified that if at any time he had told the defendant that he intended to use her car to make a drug sale she would not have let him use the car and he would end up "hitting" her and just taking the car. All he told her about going to Aurora was that he was going to meet someone at the shopping center. Nally testified that the defendant was afraid of him and she knew better than to talk back to him when he was doing

something. He would have "beat her ass" if she got out of the car. Nally also stated that he had been offered a certain number of years by the State's Attorney's office on his case if he would agree not to testify on behalf of the defendant in this case. After the State objected, this line of inquiry was disallowed by the court.

On cross-examination Nally was asked, when Kucaba asked him how good the stuff was, if he responded at the previous trial by saying "we just 'took a line' *** before we came down." Nally stated that he guessed that defendant had said that, but Nally did not think defendant said anything of significance to Kucaba and that he had told her to agree with whatever Kucaba said.

The defendant testified that she had lived in Kane County for all but three years of her life and had been a regular rural carrier with the St. Charles post office for five years. She testified that Nally had lived with her for about a year, until June of 1982, but when she realized he was taking drugs frequently she tried to kick him out. She finally had to call the police to get him out. During that summer she had been injured by him on a few occasions and had filed charges against Nally for aggravated battery. She reiterated Nally's testimony concerning how he had come to borrow her car on the day of the drug deal. She testified that during the ride she asked several times what they were going to do when they got to Aurora but that Nally kept shrugging off the question. She did not realize what was going on until she actually saw Nally pull the powder out from the pouch. At this point she said she wanted to leave and Nally told her to sit still and be quiet. She did not touch the money and had no conversation except to agree with whatever Nally said.

The St. Charles postmaster, Robert Maller, testified that the defendant had worked for the post office for five years, that she had a good work record, and that she was honest and he knew of her reputation for honesty only through work. Three other postal employees testified to the defendant's good reputation for truth and veracity. They indicated that their information was based on her conduct at work and at union activities.

As a rebuttal witness, the State called Captain Smith of the Elgin police department. He testified that he knew of the defendant's reputation for truth and veracity and that she was not always known to be truthful. On cross-examination Smith testified he had obtained knowledge of her reputation by talking to individuals, but the court sustained an objection when defense counsel asked who those individuals were. Smith testified that he came to know of the defendant because he knew Rodney Nally.

During closing argument the State argued that the Nally testimony was incredible because he had pled not guilty at his own trial but then claimed he had done all the criminal acts in the present case. The State also pointed out that Nally had nothing to lose by testifying on behalf of defendant herein. It urged that the defendant's reputation witnesses were limited to those who only knew her through her work; no one from outside the work environment testified.

After deliberation the jury found the defendant guilty as charged. The court sentenced her to a term of six years and denied the defendant's post-trial motion.

The defendant's first contention on appeal concerns the State's alleged improper attack on the credibility of Rodney Nally, defendant's key witness. Defendant argues that the State improperly challenged the Nally testimony in two ways. First, in excluding evidence that Nally had been offered leniency by the State's Attorney if Nally would agree to abstain from testifying for defendant in this case, and secondly, by arguing that Nally's not-guilty plea in his case was inconsistent with his testimony in this case.

The allegation that the State had offered a "deal" was elicited by defense counsel in his direct examination of witness Nally. The State objected and a discussion ensued in chambers. The State objected to allowing this in evidence because it was not relevant to the proceedings and argued there was no truth to the allegation. Defense counsel stated he could bring the public defender in to testify. The trial court sustained the objection, and the issue was not mentioned again.

Defendant contends that evidence of this offer for leniency was erroneously excluded because the bias of a witness, whether favorable or adverse, is always relevant on the issue of a defendant's credibility. We disagree.

■ Although the character of a witness is generally relevant, inquiry into one's reputation for truthfulness or untruthfulness is permissible only if the credibility of the witness has been attacked on that issue. (*Tedens v. Schumers* (1884), 112 Ill. 263.) Evidence of good reputation for truth and veracity is not admissible merely because one testified in a trial. Only after the credibility of the witness is placed in issue is the introduction of supporting reputation evidence warranted. (*People v. George* (1978), 67 Ill. App. 3d 102, 108, 384 N.E.2d 377, 381; *People v. Griffith* (1978), 56 Ill. App. 3d 747, 756, 372 N.E.2d 404, 411; E. Cleary & M. Graham, Handbook of Illinois Evidence sec. 608.1, at 278 (3d ed. 1979).) Absent an attack on the credibility of a witness, no supporting evidence is allowed. (McCormick, Evidence sec. 49, at 102 (2d ed. 1972).) Although the State attacked Nally's

credibility at a later point in the trial, at the time Nally attempted to introduce evidence of his negotiations with the State his credibility was not in issue. Thus, the trial court ruled correctly in disallowing the testimony at the time it was offered.

In its reply brief, defendant argues ·that the Illinois Supreme Court has approved the practice of anticipatorily allowing impeaching matter on direct examination. However, in this case defendant was offering evidence to *bolster*, not impeach, his testimony. Thus, defendant's argument is inapposite.

Defendant also argues that the State objected to the evidence of Nally's prior plea negotiations on the basis of its relevance, not on the basis of its timing. Thus, she urges, the objection to the timing of the evidence is waived on review. However, the relevancy of testimonial evidence generally must prove or disprove, or have some logical weight tending to prove or disprove, some fact in the case. (R. Hunter, Trial Handbook for Illinois Lawyers sec. 29.5, at 407 (5th ed. 1983).) In the instant case the proffered testimony was not probative of a fact in issue, and thus was not relevant. Therefore, the objection on the basis of relevancy was proper.

■ The defendant next urges that an improper attack on the Nally testimony occurred in closing argument: The prosecutor argued to the jury that the Nally testimony should be rejected because Nally admitted to having pled not guilty at his own trial and then claimed that he, not Sheila Doll, had committed the criminal acts in this case.

This argument, it is urged, was misleading because, contrary to the State's argument at trial, a plea of not guilty is not equivalent to an assertion that a person did not commit the acts constituting the crime. Defendant argues that although Nally pled not guilty, his defense was entrapment. Therefore, while he admitted commission of the acts, his entrapment defense was based on the fact that he was induced by a public officer into committing those acts. Thus, his not-guilty plea may have been consistent with his testimony in the case at bar. Therefore the State's argument may have been misleading.

The State argues that while Nally's guilty plea was referred to on two occasions in closing argument, the inconsistency was not merely in his plea, but in the fact that he testified under oath at his own trial. The State argues he had no right to testify falsely in either trial. Prior to responding to this argument, we note that the State also argues that defense counsel's failure to object to this argument effectively waives the issue for purposes of review. (*People v. Jackson* (1981), 84 Ill. 2d 350, 359, 418 N.E.2d 739, 743.) Further, defendant did not specifically raise this issue in her post-trial motions.

In light of defendant's failure to object at trial, or preserve this point in her post-trial motion, this issue may only be reviewed from a standpoint of whether or not it constituted "plain error." (87 Ill. 2d R. 615(a); see also *People v. Johnson* (1979), 76 Ill. App. 3d 147, 151, 394 N.E.2d 919.) However, before the plain error doctrine will be considered as a means of circumventing the general waiver rule, it must be apparent from the record that an error affecting substantial rights occurred. *People v. Precup* (1978), 73 Ill. 2d 7, 382 N.E.2d 227.

In the instant case the Nally testimony was critical to Sheila Doll's defense. Nonetheless, the State's attack on the credibility of that witness, even if it was improper, could only have damaged the already low level of truthworthiness of Nally. The jury was made aware that Nally had a number of previous criminal convictions, had previously sold drugs in quantity, and more importantly, it heard of the conflict between his testimony at his own trial and in the instant trial. Specifically, in the previous trial when Agent Kucaba asked how good the stuff was, Nally and defendant said, "Hey, we just had a — we just took a line while we — before we came down." In the present trial Nally conceded that he said that they "both had a line;" he urges that he "wasn't really thinking" when he said it. In any event this testimony does implicate defendant.

In light of Nally's having been impeached by his own testimony from his trial and the other factors just discussed, the prejudice resulting from the State's comments regarding his prior guilty plea, if any, was not so severe as to warrant a new trial. Although there is nothing in the record which conclusively shows that Nally did assert an entrapment defense at his trial, if he did it would mean his not-guilty plea was consistent with this testimony in the case at bar. For reasons discussed below, this cause is reversed and remanded for a new trial. If Nally's defense at his trial was entrapment then the State should not argue, at this defendant's new trial, that Nally's not-guilty plea was inconsistent with his testimony that he committed the criminal acts of the case at bar.

■ The defendant's next contention raised on appeal concerns certain alleged improper comments made by Agent Kucaba while being cross-examined by defense counsel. The colloquy in issue arose as follows:

> "Q. As a matter of fact, isn't it true the identification you made of Sheila Doll was through the license plates on the vehicle?
>
> A. That's correct. That's how we identify a lot of people.
>
> Q. Well, sometimes you know people, you identify them that

way too, don't you?

A. That's correct.

Q. All right.

A. Also I checked with Elgin Police Department, they were aware of a girl named Sheila Doll who was Rodney Nally's girlfriend.

MR. COLEMAN: I move that that answer be stricken if the Court please.

THE COURT: The answer will stand. You asked the question, Counsel.

BY MR. COLEMAN:

Q. What do you mean you checked with the Elgin Police Department?

A. When we're dealing with people from their locality we check with them, let them know who we're working on for any information, and the whole Nally family and their associates was quite well known.

MR. COLEMAN: Now I'm asking that be stricken and the jury instructed to disregard that, if the Court please.

THE COURT: The answer will stand. You asked the question, Counsel.

MR. COLEMAN: I didn't ask for that volunteered information, if the Court please.

THE COURT: The answer will stand."

Defendant's post-trial motion objected specifically to the comment regarding "the entire Nally family." On appeal, defendant contends the admission of this evidence was erroneous and it contributed to defendant's conviction so as to warrant reversal of her conviction.

The first allegedly improper statement was that the Elgin police were aware of a girl named Sheila Doll who was Rodney Nally's girlfriend. Though not responsive to a question pending, the statement was relevant to defense counsel's line of questioning regarding how he identified the defendant. Nonetheless, on a retrial volunteered testimony should be avoided.

Defendant argues that similar testimony was determined to be reversible error in *People v. Stover* (1982), 89 Ill. 2d 189, 432 N.E.2d 262. However, close inspection of that case reveals that the cause was reversed on other grounds before the court even considered the issue of the arresting officer's knowledge of defendant. In *Stover*, the prosecutor asked the arresting officer if he had been acquainted with defendant prior to the incident in issue. An objection was overruled, and the officer answered "yes." The State argued that the question

was probative of the issue of defendant's knowledge that the officer was in fact a police officer. However, because it had already been established that defendant knew the officer's status, defendant's knowledge was no longer at issue. The *Stover* court noted that evidence that an arresting officer was previously acquainted with defendant "does not necessarily imply a criminal record." (See also *People v. Rogers* (1940), 375 Ill. 54, 59.) However, in *Stover* the court directed that on retrial such inquiry not recur. The instant case is similar to the situation in *Stover*, except that, as mentioned above, Kucaba's statement was brought out after defense counsel's question on the identification of defendant. For this reason, and also because it has been held that such comments do not always imply criminal activity, the first Kucaba statement was properly allowed.

■ With regard to Kucaba's statement that "the whole family and their associates was [*sic*] quite well known," we believe that this statement was a response to defense counsel's question. A defendant cannot complain of a response that is invited or provoked by defense counsel on cross-examination. (*People v. Peter* (1973), 55 Ill. 2d 443, 303 N.E.2d 398, *cert. denied* (1974), 417 U.S. 920, 41 L. Ed. 2d 225, 94 S. Ct. 2627.) On retrial, however, the focus of the State's evidence should be centered on the defendant rather than on her relationship with the Nally family.

■ Defendant also contends that the improper inferences raised by the Kucaba testimony were heightened by the testimony of J. W. Smith, a captain with the Elgin police department. He testified he knew others who knew the defendant and she was "not always known to tell the truth all the time." Defendant urges that this created the inference that defendant had done something to become a character known to the police. The State urges that, because defendant's witnesses only knew her reputation at work, this testimony presents a more complete picture of defendant's reputation in the community where she lived. It urges that this single, isolated, brief remark does not justify a reversal, and was proper under the circumstances. This comment was also referred to in closing argument. Defense counsel urged that, contrary to the State's inference, the defendant had not ever been convicted of a crime, and if she had been, the prosecutor would have brought in proof of that conviction. Then, in rebuttal, the prosecutor told the jury that under the law a witness can only be impeached on prior convictions. Defendant argues that this creates the inference that defendant had police problems that could not legally be presented. Although this last inference of criminal activity is weak, a main theme of the State's case was defendant's vague connections

with the police.

With regard to Captain Smith's testimony, we note that defendant made no objection to Smith's direct examination—as to foundation or otherwise. Thus, any issue concerning the foundation of the Smith testimony is waived on appeal.

■■ Defendant also urges that error occurred during the cross-examination of Captain Smith. As indicated, Smith asserted that he knew defendant and her reputation for truth and veracity, and she was not always known to tell the truth. Then, on cross-examination defense counsel asked from whom Smith acquired his information about defendant. The State's objection was sustained. Defense counsel also asked if the witness himself had had occasion to test defendant's veracity. The State's objection was sustained on this point as well.

Defendant contends that this was an improper limitation on the scope of her cross-examination of Captain Smith. She argues that her credibility was a crucial aspect of her case and it was essential that she be allowed to test Smith's assertions that defendant had a bad reputation for truth.

The State argues that the attempted questioning was properly disallowed because it is improper to ask for opinions or evidence of particular acts of misconduct. (*People v. Mertens* (1979), 77 Ill. App. 3d 791, 396 N.E.2d 595, 606.) Defendant's question of whether Smith himself had tested defendant's veracity fit within this category. *People v. Greeley* (1958), 14 Ill. 2d 428, 152 N.E.2d 825.

Nonetheless, we believe Captain Smith's testimony was improperly restricted when defense counsel was not allowed to ask from whom Smith had acquired his information. This was not a request for information about a particular act of misconduct. When a witness testifies to reputation, he or she may be asked whether he has actually heard the reputation discussed, by whom, when and where. (R. Hunter, Trial Handbook for Illinois Lawyers sec. 72.13, at 1075 (5th ed. 1983).) Thus, disallowing Captain Smith's response was error.

The State contends that if error is found on this issue it should be considered harmless because the names of the sources would add little to the jury's evaluation of defendant's reputation. This is not necessarily true.

■■ A defendant has the right to cross-examine State witnesses on any matter which will explain, modify or discredit what was said on direct examination. (*People v. Strother* (1972), 53 Ill. 2d 95, 99, 290 N.E.2d 201, 204; *People v. Campbell* (1975), 28 Ill. App. 3d 480, 328 N.E.2d 608, 616.) A defendant's right to confront the witnesses which testify against him or her includes the right to cross-examine those

witnesses. The right to an effective cross-examination is protected by both the United States and Illinois constitutions. (U.S. Const., amend. VI; Ill. Const. 1970, art. I, sec. 8; *People v. Garrett* (1976), 44 Ill. App. 3d 429, 358 N.E.2d 364, 370.) Although the right to cross-examination is a matter within the trial court's discretion (*People v. Foley* (1982), 109 Ill. App. 3d 1010, 1014, 441 N.E.2d 655, 659), we believe the trial court erred in this regard.

██ Although the State urges that exploration of the basis for Captain Smith's testimony would have been of little assistance to the jury, this contention is somewhat speculative. Smith may have been unable to remember from whom or where he heard about her reputation, in which case his testimony may have been far less convincing in the eyes of the jury. Thus, it cannot be found beyond a reasonable doubt that the error was harmless.

Standing alone, the strictures placed on Captain Smith's testimony may not have been so severe as to warrant reversal. However, in light of the multitude of problems in this case—specifically the inferences of defendant's criminal connections—we cannot say this error is harmless beyond a reasonable doubt. (*Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.) The jury in this case was presented with the question of whether to believe Agent Kucaba's or the defendant's version of the drug sale. Hence her credibility was a crucial issue. We think Captain Smith's testimony was prejudicial and may have improperly influenced the jury in reaching their verdict of guilty. Although it is clear that specific acts of misconduct should not be brought out on cross-examination, the basis of Smith's testimony should have been allowed.

Although the defendant was present at the scene of the crime, the evidence which shows she was aware of what was going on was limited. This emphasizes that her credibility was a key factor in the case. Defendant was entitled to explore the basis for Captain Smith's assertions on cross-examination.

Because of this error, and because of the cumulative effect of the State's vague allegations of prior misconduct, this cause must be reversed and remanded for a new trial.

Reversed and remanded.

LINDBERG, and NASH, JJ., concur.