THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DONNA REID, Defendant-Appellant.

First District (1st Division)   No. 1—93—1350

Opinion filed April 24, 1995.

Rita A. Fry, Public Defender, of Chicago (Beth I. Solomon and Bruce Landrum, Assistant Public Defenders, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Andrea Bonin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:

Drug prosecutions can stir emotions in prospective jurors. It happened here. They also can cause prosecutors to engage in rhetorical overkill. That, too, happened here. The defendant contends these events and an evidentiary ruling concerning her proposed character witnesses fatally infected her jury trial.

We affirm her conviction of delivery of a controlled substance and her sentence of nine years' imprisonment.

JURY SELECTION

The defendant had used five of her seven allotted peremptory challenges when the trial judge began questioning prospective juror Richard Kwiecinski. The relevant questions and answers were:

"Q. Did you ever know anybody who had a problem with drugs?

A. Unfortunately quite a few people. My former partner in the commodities ended up having a very serious cocaine problem that led us to dissolve our company, and my wife's two brothers have

had drug problems. One of them had to go to Forest Hospital for treatment, and the other. one is also involved in commodities, and currently I think he has licked the habit, but there is still a problem with commodities.

Q. Do you know anybody that has actually been involved with a drug abuse program?

A. Yes, one of my brother-in-laws.

Q. Do you know of anyone who has ever died as a result of a drug overdose?

A. Well, my wife's sister, her husband's brother had—she was on cocaine and had a baby that died from that, and also my wife is in charge of the Snowflake Program or Operation Snowflake at River Trails Grade School which is an anti-drug program, and they're also involved with doing fund raisers for the Merriville Columbia Hospital for, you know, deformed babies from cocaine.

Q. *** This defendant is charged with delivery of a controlled substance: to-wit, cocaine. Do you think that gives you any preconceived notions about the case at all?

A. I would try not to think it would. I don't know what might happen when the trial starts ***.

Q. *** Do you think that you are able to keep an opened [sic] mind, to listen to the State's case, and the defense case as to what extent they want to present any evidence, listen to the evidence and the arguments and listen to the law as they instruct you and then based upon that form your decision?

A. Well, I think I could, yes.

Q. So you think basically you would really try to give both sides a fair trial?

A. Right.

Q. And if you feel the State proves the defendant guilty beyond a reasonable doubt, would you have any problems signing a guilty verdict?

A. No, I wouldn't.

Q. And if they failed to do so, would you have any problems signing a not guilty verdict?

A. No."

Then the defendant's lawyer asked the prospective juror:

"Q. *** She will testify. Would your decision on her credibility be influenced on what happened to your business?

A. I would try not to let it influence me, but it did have a major effect on my life, and I would try not to have that affect me.

Q. But you don't know if it would or not until we actually start?

A. Exactly."

The next prospective juror was Donald O'Meara. After he was questioned by court and counsel, the defense exercised its sixth pe-

remptory challenge against a prospective juror named Salazar. Then it asked that juror Kwiecinski be challenged for cause. The judge refused, holding that the juror's answers demonstrated an open mind. The defense then used its final peremptory challenge on Kwiecinski.

When the defense asked for an additional peremptory challenge for juror O'Meara, the trial judge said: "It's seven and seven. That's what you are entitled to. That's what you get."

The trial proceeded with Donald O'Meara on the jury.

While Donna Reid's jury trial took place, the judge heard codefendant Charles Dean's case as a bench trial.

EVIDENCE AT TRIAL

Most of the State's case came from James Perille, an undercover narcotics officer for the Schaumburg police department. He testified:

On March 21, 1991, he telephoned codefendant Charles Dean and asked if he had four ounces of cocaine. Dean told Perille that while he did not have the cocaine at that time, he would contact "his guy" and obtain it the following day. Dean then told Perille to pick him up at his apartment at 3 p.m. the following day.

Before meeting Dean, Perille briefed his partner and other investigators about the narcotics transaction and obtained $7,600 from the Schaumburg police department to purchase the narcotics. Perille proceeded to Dean's apartment, where Dean entered Perille's car and informed him that he needed to contact his source to obtain the cocaine. After talking with someone on a cellular telephone, Dean directed Perille to drive to a parking lot on Damen Avenue.

Approximately 10 minutes after he arrived at that location, Perille observed a red car enter the parking lot and park behind him. Dean then said, "Here's my guy," exited the car, walked over to the red car, and had a conversation with the driver of that vehicle. Perille looked at his rear-view mirror and observed a man, two women and an infant inside the red car. Dean then returned to Perille's car and informed him that one of the women would come over to count the money.

Moments later, the defendant, Donna Reid, walked over to Perille's trunk and counted out $5,000 that Perille had placed inside. After counting the money, the defendant placed it back into the trunk and walked back to the red car where she talked to the driver. Both the driver and the defendant then walked to a nearby telephone booth. Dean returned to Perille's car and told him they had to proceed to another location to receive the cocaine.

About 10 minutes after Perille and Dean reached a second parking lot, the red car arrived. Dean then told Perille, "My guy is here.

Let's get the money ready. It's going to go." Perille and Dean then left the car and opened the trunk.

While they were walking toward Perille's car, the driver of the red car handed something to the defendant. The defendant then walked to Perille's trunk and placed four plastic bags containing a white powdery substance into the trunk. Perille handed the defendant a bundle of money which she placed in her pocket as she began to walk away. Perille then activated a prearranged signal and surveillance units converged at the scene. Officer Reninger yelled "Stop, police," but the defendant continued to run until she was apprehended by officers.

After being transported to the police station and being informed of her *Miranda* rights, the defendant was given a blank sheet of paper and asked to write her version of the events surrounding her arrest. Perille testified that the defendant wrote that she gave the man the "ting." When asked by officers to clarify this statement, the defendant said she was referring to cocaine but did not know how to spell the word. Perille then spelled "cocaine" orally while the defendant printed the word in her statement.

Catherine Hunt, a forensic scientist, testified that the bags placed by the defendant into Perille's car trunk contained 117 grams of a substance containing cocaine.

At the end of the State's case, the State objected to the defendant's proposed use of character witnesses. Defendant said she would testify to her truth, honesty, reputation for law and order, and her naivete and predisposition to be influenced by others. She said her two character witnesses would then testify to her reputation in her family for those traits. They also would say they had never seen her use cocaine. The trial judge excluded the defendant's character witnesses.

The defense consisted almost entirely of the defendant's testimony. She testified:

On March 21, 1991, she was on her way to the hospital when Seymour Hunter, whom the defendant knew as "Bunny," offered her a ride. She accepted the offer and she and her child entered Hunter's red car.

On the way to the hospital, Hunter asked her if she would count some money for him. Hunter then drove to a parking lot and directed her to Perille's car where she counted the money contained in the trunk. Hunter then motioned for her to join him near a telephone booth and asked her if the money was in the trunk. She told Hunter that there was $5,000 in Perille's trunk. She and Hunter then drove

to another parking lot where Hunter told her to give her child to the rear-seat passenger. The rear-seat passenger then exited the car and took her child into a store.

At Hunter's request, the defendant then left the red car and entered a dark car driven by another man. The driver handed her four plastic bags and instructed her to place them in her pocket. She complied and was then driven to another parking lot where she exited the car and, recognizing only Perille, walked toward him. When Dean asked her if she had the "stuff," she responded that she had the "ting." Perille then opened his trunk and told her to place the "stuff" inside. She removed the plastic bags from her pocket and placed them in the trunk. Dean then handed her some money and she began to walk away. When someone yelled "Police, freeze," she did not understand what was happening and began to run.

FINAL ARGUMENT

The defendant raises several issues concerning the State's final argument. We set out one portion of the State's argument:

> "Ladies and gentlemen, as I was saying, you can't tell family members of people who have been destroyed by drugs that it is a victimless crime. And you can't tell people who have their cars broken into or who have their homes burglarized or who have been mugged that drug offenses are victimless crimes because drugs make people happy, especially those who use it.

> And it makes them so happy that they want the drugs real bad, and they are illegal, and they cost because four ounces of that garbage, as you heard from this trial, costs $5,000. And right now, there is [sic] 18,000 Marines in Somalia who are there to feed millions of people who are starving over there and risking their lives. And they are risking their lives because the people of Somalia, who are in a position to do something and distribute the food that other nations have sent there would rather chew that new drug Khat *** and ride around in Jeeps with machine guns than to do anything to help their own people.

> And you don't have to look as far as Somalia to figure out what drugs are doing to society and whether or not it's a victimless crime or not. All you have to do is pick up a local paper.

> * * *

> Now, I will tell you one last thing. If you allow your sympathy or your minds to be clouded by other than the facts in this case, then you are not the solution to the problem with drugs today. You will become part of that problem."

DECISION

## JURY SELECTION

The principles we must bear in mind are contained in *People v. Cole* (1973), 54 Ill. 2d 401, 298 N.E.2d 705.

The right to an impartial jury is so fundamental to due process that an infringement of that right requires reversal by a reviewing court. *Cole*, 54 Ill. 2d at 413.

Impartiality is not a technical concept; rather, it is a "state of mind." *Cole*, 54 Ill. 2d at 411.

The burden of showing that the juror possesses a disqualifying state of mind is on the party challenging the juror. That party must show the actual existence of such an opinion in the mind of the juror "as will raise the presumption of partiality." *Cole*, 54 Ill. 2d at 413.

More than a mere suspicion of bias must be demonstrated. *Cole*, 54 Ill. 2d at 415.

The determination of whether a prospective juror is biased is within the sound discretion of the trial judge, whose decision will not be reversed unless it is against the manifest weight of the evidence. *Cole*, 54 Ill. 2d at 414.

In this case, prospective juror Kwiecinski's life had been touched by cocaine. He seemed to be saying he was starting out as fair and impartial, that he would "try" not to let his experience affect his judgment on the defendant's credibility, but that he could not know until after the trial started whether his personal experience with cocaine would have an impact on his view of the defendant's testimony.

Juror Kwiecinski's remarks must be considered as a whole. He need not express himself with "meticulous preciseness." *People v. Martin* (1995), 271 Ill. App. 3d 346, 354.

In *Martin*, a murder case, the juror was asked:

"Q. Is there anything about this type of case that would prevent you from being fair and impartial?

A. I don't think so." *Martin*, 271 Ill. App. 3d at 353.

When pressed for a more specific answer, the juror said: "Like I said, I don't think so. I haven't heard any testimony yet." *Martin*, 271 Ill. App. 3d at 353.

The trial judge refused to strike the juror for cause. We held that ruling was not an abuse of discretion.

Other decisions stand for the proposition that a juror's state of uncertainty does not necessarily mean the juror is unqualified to serve. In *People v. Barragan* (1993), 266 Ill. App. 3d 961, 975, 641 N.E.2d 535, a murder case, the juror was asked:

"Q. Do you feel that you could listen to all the evidence before you made up your mind?

A. It would be kind of tough.

Q. Do you think you could not be fair to either the State or the defense?

A. It would be hard."

That juror, like the juror in this case, did not express any fixed opinion as to the defendant's guilt. In other answers, that juror, like the juror in this case, expressed a willingness to follow the law and give both sides a fair trial. The court held the trial judge did not abuse his discretion when he refused to excuse the juror for cause.

The potential juror in *People v. Tipton* (1991), 222 Ill. App. 3d 657, 664, 584 N.E.2d 310, a sexual assault case, was asked whether the fact that her sister had been raped five years earlier would influence her consideration of the case. Her answer: "I don't know. I honestly don't know. I would try to *** Do my best." It was not an abuse of discretion to refuse to dismiss the juror for cause.

*People v. Johnson* (1987), 162 Ill. App. 3d 952, 954, 516 N.E.2d 343, was another case where a juror's willingness to "try" was enough to overcome a challenge for cause. That prospective juror was a gun control advocate. The charge was armed robbery. When asked if she would follow the law, she said: "I would try." When asked if she would be fair and impartial, she said: "I would try." Since the trial judge "was in a position to evaluate this response and fairly decide its candor," the denial of the defendant's challenge for cause was not an abuse of discretion. 162 Ill. App. 3d at 954.

The facts before us approach, but do not reach, the situation in *People v. Delgado* (1992), 231 Ill. App. 3d 117, 596 N.E.2d 149, a case relied on by the defendant.

In *Delgado*, a controlled substance case, a close friend of the juror had died as a result of a drug overdose. The trial judge and the defense repeatedly asked him if he could be fair and impartial. Each time, he equivocated. The refusal to excuse the juror for cause was held to be error.

Similar equivocal and self-doubting responses concerning fairness and impartiality have been held to be sufficient reasons to excuse potential jurors for cause. See *People v. Johnson* (1991), 215 Ill. App. 3d 713, 575 N.E.2d 1247; *People v. Harris* (1990), 196 Ill. App. 3d 663, 554 N.E.2d 367; *People v. Washington* (1982), 104 Ill. App. 3d 386, 432 N.E.2d 1020.

■ After a careful examination of the *voir dire* proceedings in general, and juror Kwiecinski's interrogation in particular, we cannot say the trial judge in this case abused his discretion when he denied the challenge for cause.

This is a close case. Trial judges should not give grudging acceptance to the defendant's constitutional right to a fair and impartial jury. Since this is a matter for "sound discretion" (*People v. Seuffer* (1991), 144 Ill. 2d 482, 502, 582 N.E.2d 71), and not *de novo* review, we find no error.

Whether the trial judge, in fact, had the inherent authority to grant an additional peremptory challenge has never been decided by the supreme court. Some appellate decisions have held that the trial court does have that discretionary power. (See *People v. Delgado* (1992), 231 Ill. App. 3d 117, 121, 596 N.E.2d 149; *People v. Washington*, 104 Ill. App. 3d at 392.) But in *People v. Hobley* (1994), 159 Ill. 2d 272, 637 N.E.2d 992, the supreme court expressly declined to consider whether trial judges have discretion to grant peremptory challenges in addition to those provided by Supreme Court Rule 434(d).

Assuming, arguendo, the trial judge in this case had such discretion, there would be no prejudicial error. The defendant made no showing that an "objectionable juror" was forced on her after she exhausted her peremptory challenges. See *People v. Marts* (1994), 266 Ill. App. 3d 531, 540, 639 N.E.2d 1360; *People v. Washington*, 104 Ill. App. 3d at 392.

An "objectionable juror" has been defined as "a juror who should have been dismissed for cause—one who would prejudice the case." (*Flynn v. Edmonds* (1992), 236 Ill. App. 3d 770, 782, 602 N.E.2d 880.) The defendant takes the position that an "objectionable juror" is anyone she did not want on her jury. We do not agree. There must be some attempt to persuade the trial judge that a juror the defendant was required to accept could not be fair and impartial. The failure to make such a showing forecloses further consideration of the issue. *People v. Washington*, 104 Ill. App. 3d at 392.

## EXCLUSION OF THE DEFENDANT'S CHARACTER WITNESSES

The decision to admit character evidence is within the sound discretion of the trial court and will not be disturbed on review unless there is an abuse of discretion. *People v. Batinich* (1990), 196 Ill. App. 3d 1078, 554 N.E.2d 613.

Evidence of a good reputation in the community must relate to a particular character trait involved in the offense charged. *People v. Hall* (1987), 159 Ill. App. 3d 1021, 1027, 513 N.E.2d 429.

In this State, character must be proved by general reputation based on the witness' contact with the defendant's neighbors and associates, not on the witness' personal opinion. *People v. Sargent* (1990), 207 Ill. App. 3d 631, 638, 566 N.E.2d 318.

Evidence of good reputation for truth and veracity is permissible only when the credibility of the defendant has been attacked. *People v. Doll* (1984), 126 Ill. App. 3d 495, 467 N.E.2d 335.

Specific instances of relevant conduct may not be used to establish good or bad character. M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 405.1 (6th ed. 1994).

■ Applying these principles to this case, we find no error in the trial judge's exclusion of the defendant's character witnesses.

*People v. Perez* (1991), 209 Ill. App. 3d 457, 568 N.E.2d 250, relied on by the defendant, does not apply here. *Perez* was an entrapment case, where the defendant's readiness to violate the law was an issue. Here, evidence of naivete, manipulability, and lack of experience with narcotics would have little or nothing to do with the charge of delivery of a controlled substance. Further, we seriously doubt whether these are the kinds of character traits the law envisions in any case.

The defendant testified freely to her mental state and knowledge at the time of the offense. She was allowed to testify to her own truthfulness and honesty in the community. The trial judge properly refused to extend the established boundaries for character evidence.

THE STATE'S FINAL ARGUMENT

The defendant complains of several comments made by the State during its final argument. Some of the claimed errors were waived by a failure to object at the time. Some comments were invited responses. Some words, such as those we set out above, would have been better left unsaid.

We recognize that prosecutors have been authorized to argue the evils of drug abuse and the need to punish drug dealers. *People v. Lopez* (1957), 10 Ill. 2d 237, 139 N.E.2d 724; *People v. Bianchi* (1981), 96 Ill. App. 3d 113, 117, 420 N.E.2d 1187.

■ The argument in this case went beyond a call for a victory in the "war on drugs." The prosecutor's remarks ranged from "the family members of people who have been destroyed by drugs" to "18,000 Marines in Somalia who are there to feed millions of people."

This court expressed discomfort with these kinds of comments in *People v. Loferski* (1992), 235 Ill. App. 3d 675, 688-90, 601 N.E.2d 1135. Here, as there, we note that the courts of this State have upheld similar arguments. In addition, the defendant in this case cannot demonstrate that the result of her trial would have been different had these or any of the other prosecution comments not been made. *People v. Moreno* (1992), 238 Ill. App. 3d 626, 634, 606 N.E.2d 514.

## CONCLUSION

We affirm the defendant's conviction.

Judgment affirmed.

CAMPBELL, P.J., and BRADEN, J., concur.